ACCEPTED
06-15-00044-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
12/21/2015 4:21:49 PM
DEBBIE AUTREY
CLERK

# No. 06-15-00044-CV

## IN THE SIXTH COURT OF APPEALS
## TEXARKANA, TEXAS

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
12/22/2015 8:08:00 AM
DEBBIE AUTREY
Clerk

## BURLINGTON RESOURCES OIL & GAS COMPANY, LP,
*Appellant,*

v.

## PETROMAX OPERATING CO., INC., WOODBINE ACQUISITION, LLC, PETRO TEXAS, LLC, CH4 ENERGY II, LLC, AND TEXCAL ENERGY SOUTH TEXAS, L.P.,
*Appellees.*

## BRIEF OF APPELLEES

**THOMPSON & KNIGHT LLP**
Greg W. Curry
State Bar No. 05270300
greg.curry@tklaw.com
Richard B. Phillips, Jr.
State Bar No. 24032833
rich.phillips@tklaw.com
Gregory D. Binns
State Bar No. 24027148
greg.binns@tklaw.com
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
214-969-1700; Fax: 214-969-1751
*Counsel for Appellee*
*Woodbine Acquisition, LLC*
*n/k/a MD America Energy LLC*

**ATCHLEY, RUSSELL, WALDROP & HLAVINKA, LLP**
Jeffery C. Lewis
State Bar No. 12280950
jlewis@arwhlaw.com
1710 Moores Lane
Texarkana, Texas 75503
903-792-8246; Fax: 903-792-5801
*Counsel for Appellee*
*Woodbine Acquisition, LLC*
*n/k/a MD America Energy LLC*

**HANKINSON LLP**
Deborah G. Hankinson
State Bar No. 00000020
dhankinson@hankinsonlaw.com
Stephanie Dooley Nelson
State Bar No. 24002006
snelson@hankinsonlaw.com
750 N. St. Paul St., Suite 1800
Dallas, Texas 75201
214-754-9190; Fax: 214-754-9140
*Counsel for Appellee*
*TexCal Energy South Texas, L.P.*

**PIERCE & O'NEILL, LLP**
Jesse R. Pierce
State Bar No. 15995400
jpierce@pierceoneill.com
Brian K. Tully
State Bar No. 24039217
btully@pierceoneill.com
4203 Montrose Boulevard
Houston, Texas 77006
713-634-3600; Fax: 713-634-3601
*Counsel for Appellee*
*TexCal Energy South Texas, L.P.*

**BECK REDDEN LLP**
David J. Beck
State Bar No. 00000070
dbeck@beckredden.com
David M. Gunn
State Bar No. 08621600
dgunn@beckredden.com
Thomas E. Ganucheau
State Bar No. 00784104
tganucheau@beckredden.com
Jim Taylor
State Bar No. 00788512
jtaylor@beckredden.com
1221 McKinney, Suite 4500
Houston, TX 77010
713-951-3700; Fax: 713-951-3720
*Counsel for Appellees,*
*PetroMax Operating Co., Inc.,*
*Petro Texas LLC, and*
*CH4 Energy II, LLC*

**CANTEY HANGER LLP**
Brad D'Amico
State Bar No.00783923
bd@canteyhanger.com
1999 Bryan Street, Suite 3300
Dallas, TX 75201
214-978-4100; Fax: 214-978-4150
*Counsel for Appellee*
*PetroMax Operating Co., Inc.*

## ORAL ARGUMENT CONDITIONALLY REQUESTED

## IDENTITY OF PARTIES AND COUNSEL

In addition to the counsel listed in Appellant's Brief, please note the appearance of the following additional counsel:

David M. Gunn
State Bar No. 08621600
dgunn@beckredden.com
Jim Taylor
State Bar No. 00788512
jtaylor@beckredden.com
BECK REDDEN LLP
1221 McKinney, Suite 4500
Houston, TX 77010-2010
(713) 951-3700
(713) 951-3720 (Fax)
*Counsel for Appellees,*
*PetroMax Operating Co., Inc.,*
*Petro Texas LLC, and*
*CH4 Energy II, LLC*

Deborah G. Hankinson
State Bar No. 00000020
dhankinson@hankinsonlaw.com
Stephanie Dooley Nelson
State Bar No. 24002006
snelson@hankinsonlaw.com
HANKINSON LLP
750 N. St. Paul St., Suite 1800
Dallas, Texas 75201
Phone: 214-754-9190
Fax: 214-754-9140
*Counsel for Appellee*
*TexCal Energy South Texas,*
*L.P.*

Jeffery C. Lewis
State Bar No. 12280950
jlewis@arwhlaw.com
ATCHLEY, RUSSELL, WALDROP
    & HLAVINKA, LLP
1710 Moores Lane
Texarkana, Texas 75503
Phone: 903-792-8246
Fax: 903-792-5801
*Counsel for Appellee*
*MD America Energy, LLC*
*f/k/a Woodbine Acquisition LLC*

# TABLE OF CONTENTS

**Page**

IDENTITY OF PARTIES AND COUNSEL ................................................................. i

TABLE OF CONTENTS ........................................................................................ ii

INDEX OF AUTHORITIES.................................................................................... iv

STATEMENT OF THE CASE ................................................................................. vii

STATEMENT REGARDING ORAL ARGUMENT ........................................................ viii

ISSUE PRESENTED.............................................................................................. ix

STATEMENT OF FACTS........................................................................................1

SUMMARY OF THE ARGUMENT ...........................................................................8

ARGUMENT .......................................................................................................10

    I.    PRINCIPLES OF CONTRACT CONSTRUCTION. ..........................................10

    II.    THE ONLY REASONABLE INTERPRETATION OF THE ASSIGNMENT. ..................................................................................11

    III.    BURLINGTON'S CONSTRUCTION IS NOT REASONABLE. ........................14

        A.    Burlington's Construction Requires Ignoring Essentially All of the Granting Clause. ..................................16

        B.    Burlington's Construction Makes No Sense in Light of the Obligations/Indemnity Clause. ............................17

        C.    Burlington's Construction Does Not Explain Why Exhibit A Would Switch the Order From the Text, or Adequately Explain What "Associated Wells" Is Supposed to Mean. .............................18

        D.    Burlington Does Not Explain Why It Would Be Necessary to Reserve the Odom Lease.................................20

E. Burlington's Construction Renders the "Less and Excepted" Clause Essentially Meaningless, or Completely Misleading..........................21

F. The Leases Cannot Be What Was Reserved Because They Cannot Be "From" the Wells. ..........................23

IV. PAROL EVIDENCE CANNOT BE USED TO ALTER THE PLAIN MEANING OF THE ASSIGNMENT AND DOES NOT CHANGE THE EQUATION IN ANY EVENT.................................25

A. The Alleged Evidence of "Surrounding Circumstances." ..........................................26

1. The Auction Catalog........................................26

2. The Understanding of the Purchaser and Seller. ..........................................30

B. The Post-Transaction Parol Evidence.........................32

C. This Court Should Not Rely on Parol Evidence in Construing a Deed. ..........................................33

V. BURLINGTON IS NOT ENTITLED TO JUDGMENT ON ITS 25% ISSUE....................................................35

PRAYER FOR RELIEF.......................................................37

CERTIFICATE OF SERVICE.................................................41

CERTIFICATE OF COMPLIANCE ..........................................42

APPENDIX

Assignment and Bill of Sale (Supp. CR 1:64-69) ..................... TAB A

Order Granting Defendants' Motion for Summary Judgment on Title Issues (CR 1617)..................... TAB B

Order Denying Burlington's Motion for Partial Summary Judgment Seeking Various Declarations (CR 1618-19) ..................... TAB C

iii

# INDEX OF AUTHORITIES

**CASES**                                                  **Page(s)**

*Am. Mfrs. Mut. Ins. Co. v. Schaefer*
124 S.W.3d 154 (Tex. 2003) ...............................................................36

*Americo Life, Inc. v. Myer*
440 S.W.3d 18 (Tex. 2014)...........................................................26, 33

*Anglo-Dutch Petroleum Int'l, Inc.*
*v. Greenberg Peden, P.C.*
352 S.W.3d 445 (Tex. 2011) ...............................................................26

*Capitan Enters., Inc. v. Jackson*
903 S.W.2d 772 (Tex. App.—El Paso
1994, writ denied) ...............................................................................36

*Cincinnati Life Ins. Co. v. Cates*
927 S.W.2d 623 (Tex. 1996) ...............................................................35

*Coker v. Coker*
650 S.W.2d 391 (Tex. 1983) ...............................................................10

*Day & Co., Inc. v. Texland Petroleum, Inc.*
786 S.W.2d 667 (Tex. 1990) ...............................................................34

*In re Dillard Dept. Stores, Inc.*
186 S.W.3d 514 (Tex. 2006) ...............................................................33

*State v. Dunn*
574 S.W.2d 821 (Tex. Civ. App.—Amarillo
1978, writ ref'd n.r.e.)..........................................................................34

*El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*
389 S.W.3d 802 (Tex. 2012) ...............................................................10

*Friendswood Dev. Co. v. McDade & Co.*
926 S.W.2d 280 (Tex. 1996) ...............................................................10

*Frost Nat'l Bank v. L&F Distribs., Ltd.*
165 S.W.3d 310 (Tex. 2005) ...............................................................36

*Garza v. Prolithic Energy Co., L.P.*
  195 S.W.3d 137 (Tex. App.—San Antonio
  2006, pet. denied).................................................................32

*Gonyea v. Kerby*
  No. 10-12-00182-CV, 2013 WL 4040117
  (Tex. App.—Waco Aug. 8, 2013, pet. denied).....................................34

*Houston Exploration Co. v. Wellington*
  *Underwriting Agencies, Ltd.*
  352 S.W.3d 462 (Tex. 2011) ............................................25, 26

*J.M. Davidson, Inc. v. Webster*
  128 S.W.3d 223 (Tex. 2003) ............................................14, 25

*Kachina Pipeline Co., Inc. v. Lillis*
  471 S.W.3d 445 (Tex. 2015) ............................................14, 25

*King v. First Nat'l Bank of Wichita Falls*
  192 S.W.2d 260 (Tex. 1946) ................................................12

*Lewis v. Midgett*
  448 S.W.2d 548 (Tex. Civ. App.—Tyler
  1969, no writ)...............................................................34

*Matagorda Cnty. Hosp. Dist. v. Burwell*
  189 S.W.3d 738 (Tex. 2006) ................................................25

*MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*
  995 S.W.2d 647 (Tex. 1999) ................................................10

*Mitchell v. Mitchell*
  445 S.W.3d 790 (Tex. App.—Houston
  [1st Dist.] 2014, no pet.) ..................................................35

*Pich v. Lankford*
  302 S.W.2d 645 (Tex. 1957) ................................................12

*Sun Oil Co. (Delaware) v. Madeley*
  626 S.W.2d 726 (Tex. 1981) ............................................25, 26

*Valence Operating Co. v. Dorsett*
    164 S.W.3d 656 (Tex. 2005) ........................................................................10, 35


**OTHER AUTHORITIES**

Bruce M. Kramer,
    *The Sisyphean Task of Interpreting Mineral
    Deeds and Leases:  An Encyclopedia of
    Canons of Construction*,
    24 TEX. TECH L. REV. 1, 14 (1993)....................................................................34

# STATEMENT OF THE CASE

*Nature of the case*      This oil and gas case turns on the interpretation of a 1994 Assignment that is 3-pages long with a 1-page exhibit.

The parties dispute whether the assignment conveyed four described leases, or only four specific wells. If it conveyed four leases, then the area of mutual interest ("AMI") on which Appellant's claims rely expired and Appellant's claims fail. If it conveyed only four specific wells, Appellant's claims remain subject to Appellees' other defenses and the case should be remanded.

*Trial court*      12th District Court, Madison County, Texas (Hon. Donald L. Kraemer, presiding)

*Course of proceedings*      Burlington filed suit against Appellees (collectively, the PetroMax Defendants) alleging a breach of the AMI provisions of a 1975 Letter Agreement. Appellees denied these claims and filed counterclaims seeking to quiet their title. The two sides filed competing summary judgment motions centering on the issue of whether the AMI had expired.

*Trial court disposition*      The trial court denied Burlington's summary judgment motion and granted the PetroMax Defendants' summary judgment motion. The trial court ruled that

(1) Burlington owns no interest in the AMI; and

(2) the AMI provision has terminated.

The court severed the remaining claims to make its summary judgment final.

**STATEMENT REGARDING ORAL ARGUMENT**

Oral argument is not necessary because this appeal involves application of familiar contract-construction principles to an unambiguous assignment. But if the Court grants Burlington's request for oral argument, the PetroMax Defendants reserve their right to participate.

## ISSUE PRESENTED

The issue on appeal is whether the trial court properly interpreted the 1994 Assignment as conveying four oil and gas leases and not just four wells without the underlying leases.

# STATEMENT OF FACTS

The resolution of the case turns entirely on the interpretation of a 3-page assignment with a 1-page exhibit. The important facts in this appeal, those necessary for resolution, are simply stated.

In 1975, Buttes Resources Company owned an undivided one-half working interest in nine oil and gas leases. CR:589. Buttes and Aztec Oil and Gas Company entered into a letter agreement to facilitate joint efforts to explore for and develop oil and gas. As part of that agreement, Buttes conveyed to Aztec an undivided 25% interest in those nine leases. CR:589, 591-92.

In addition, Buttes and Aztec entered into an area of mutual interest ("AMI") agreement providing that if either party obtained an oil and gas interest within the boundaries of the AMI, it was obligated to offer the other party a participation in that interest proportionate to their ownership of the original nine leases. In other words, Buttes would have to offer Aztec an undivided 25% interest, and Aztec would have to offer Buttes an undivided 75% interest. CR:593.

The 1975 Letter Agreement provided that the AMI would remain in force and effect only so long as there continued to exist jointly-owned leases within the AMI. CR:593. It is undisputed that six of the original nine leases no longer exist

or are no longer jointly owned.[1]  The only three leases still at issue are 1) the Gibbs Lease, 2) the Wilson Lease, and 3) the Buchanan Lease.

Much has changed since 1975. The original interests held by Buttes and Aztec have changed hands multiple times.  Ultimately, the PetroMax Defendants[2] are assignees of a portion of Buttes's interest.  CR:437.  Burlington[3] is a successor in interest to Aztec.  CR:435, 437.[4]  Importantly, an intermediate successor in interest to Aztec, in Burlington's chain of title, was a company called Southland Royalty Company.  CR:435, 437.

This is significant because in 1994, Southland entered into an assignment (the "Assignment") with Samson Resources Company that involved all three of the disputed leases – the Gibbs, Wilson, and Buchanan leases.[5]  Supp. CR 1:64-69. More specifically, the Assignment stated that Southland

---

[1] *See* Appellant's Brief at 5.  Four of the original leases terminated in 1979 at the end of their primary terms. CR:74.  With regard to a fifth lease, all but one well was assigned to a third party in 1981, and the remaining well was assigned to another third party in 1997.  *Id*.  A sixth lease expired upon cessation of production in 1999.  *Id.*

[2] Defendants/Appellees PetroMax Operating Co., Inc. ("PetroMax"), Woodbine Acquisition, LLC ("Woodbine"), Petro Texas, LLC, CH4 Energy II, LLC, and TexCal Energy South Texas, L.P. ("TexCal").

[3] Plaintiff/Appellant Burlington Resources Oil & Gas Company, LP.

[4] There are at least four other successors to Aztec's interests.  Supp CR 3:842, 3:1277-78, 3:2147-2763.  Defendant Woodbine is also an assignee of a portion of Aztec's interest.  Supp CR 3:67-105, 2531-58.

[5] The Assignment is attached as Appendix A.

2

> does hereby assign, transfer, grant and convey to Samson Resources Company ... all of Assignor's right, title and interest in and to the following: (i) The oil and gas **leases ...** particularly ***described on Exhibit "A"*** ... (collectively the **"*Leases*"**) ... (ii) The ***wells*** ... on the ***Leases*** ...

Supp. CR 1:64 (emphasis added). In addition, the Assignment contains a reservation clause providing that Southland reserved from the conveyance certain interests "specifically noted and reflected on Exhibit 'A'." *Id.*

Exhibit A described four oil and gas leases as follows:



Supp. CR 1:68.

The position of the PetroMax Defendants is that the four leases described in Exhibit A were conveyed in 1994, that the conveyance included the non-exclusive list of wells associated with the leases that is set forth at the bottom of the exhibit, and that the only properties exempt from the assignment were the wells identified in the "Less and Excepted" clause appended to the list of leases. Supp. CR 1:13-17; Supp. CR 2:1339-40, 1352.

3

Indeed, that is what Samson believed it purchased. Supp. CR 2:1362-65. Moreover, for more than sixteen years, that is what Southland, and its successors (including Burlington), believed it sold. Supp. CR 1:115, 117, 119, 121-22; *see also* Supp. CR 2:1464-73, 1873.

For its part, Burlington contends that the Assignment did not convey the four leases described in Exhibit A, or any lease. Appellant's Brief at 19. Rather, Burlington takes the position that the Assignment conveyed only four specific wells, and nothing else. *Id.*; CR:1411. Consequently, Burlington argues that Southland continued to own the four oil and gas leases described in Exhibit A, and that it (Burlington) eventually succeeded to those interests. Appellant's Brief at 14.

There are other issues that would require adjudication at trial if the Court were to accept Burlington's interpretation of the Assignment. Because the trial court determined that the AMI terminated, it never addressed other issues, such as the affirmative defenses raised by the PetroMax Defendants,[6] and the 25% proportionate-reduction issue discussed in Appellant's Brief. *See* CR:1148; Appellant's Brief at 34-35. However, this dispute rises or falls with the interpretation of the Assignment.

---

[6] These defenses include that Burlington (and its predecessors) waived enforcement of the AMI provision and that the AMI provision (i) does not satisfy the statute of frauds; (ii) lacks an essential term; and (iii) violates the Rule Against Perpetuities. Supp. CR 3:42-43. Burlington makes no effort to address these defenses in its brief.

PetroMax[7] acquired its interest in the Wilson Lease in 2009 and embarked on a plan to drill new wells on the lease. CR:647-58. Based on a 2007 title opinion,[8] PetroMax sent Burlington various Authorities for Expenditure ("AFEs") regarding participation in proposed wells on the Wilson Lease. Supp. CR 2:1326-28, 1330-32, 1334-36, 1343, 1352.

After receiving these AFEs, Burlington[9] reviewed its internal records, which reflected that it no longer owned any such interest because the Wilson Lease had been sold to Samson in the 1994 Assignment. Supp. CR 1:115, 117, 119, 121-22; *see also* Supp. CR 2:699-700, 1464-73, 1873; Supp. CR 3:1494-1877, 1583, 1671, 1686-87, 1718, 1728-32, 1738. For instance, an internal memorandum dated August 28, 2009, stated as follows:

> Burlington Resources received multiple ballot letters in regards to the Wilson #1 H Well, James D Wilson Lease . . . . The ballot listed Burlington Resources Oil & Gas Company (BROG) as a successor in interest to Southland royalties . . . . The remaining interest was sold from BROG to Samson Resources in September 1994 . . . . The

---

[7] The interests of the other Appellees (Petro Texas, LLC; CH4 Energy II, LLC; TexCal South Texas, L.P.; and Woodbine) derive from PetroMax's original interest.

[8] Attorney J. Jan Jircik prepared a Leasehold Estate Title Opinion dated as of January 4, 2007 that concluded that Burlington possessed an interest in the Wilson Lease. CR:861. Attorney Ron Moore performed subsequent title work. In part of his work, Moore simply incorporated, without critical analysis, Jircik's conclusions with respect to the Southland Assignment. Supp. CR 2:1355. That is industry practice. *Id.* When subsequently requested to focus on the Southland Assignment, Moore concluded that it "apparently conveys all of Southland's right, title and interest in and to" the leases at issue. Supp. CR:2:1359.

[9] It should be noted that Burlington's immediate predecessor was ConocoPhillips and some of this initial review was undertaken by ConocoPhillips.

> systems and files show that this Assignment conveyed all interest in the primary lease. All systems and files show that BROG does not have any interest in the proposed lease.

Supp. CR 1:121. Accordingly, Burlington responded that it owned no such interest, and thus it would not participate. Supp. CR 1:121-22; Supp. CR 3:1671, 1684-85. This cycle was repeated several times over the next two years as PetroMax, and subsequently Woodbine, proposed additional wells. *See, e.g.*, Supp. CR 3, 1690-91, 1697-1706, 1774-77.

However, in late 2011, after several successful wells had been drilled, Burlington changed its tune. Supp. CR 1:124. Supposedly based on a new interpretation of the 1994 Assignment, Burlington took the position that it did, in fact, own an interest in the Wilson Lease. Supp. CR 2:1807; Supp. CR 3:1740-43. Furthermore, Burlington claimed that it had succeeded to Aztec's rights under the 1975 Letter Agreement and that, pursuant to the AMI, it should have been offered a 25% participation in all of the new wells. CR:12.

After further review of the 1994 Assignment, the PetroMax Defendants determined that the Wilson Lease had been sold in the 1994 Assignment and thus the AMI had terminated. Supp. CR 1:12.

Burlington filed suit seeking to enforce its alleged rights in the AMI. CR:10-17. The PetroMax Defendants denied Burlington's claims and filed counterclaims seeking to quiet title. CR:313-20. Each side filed summary

6

judgment motions focusing mainly on whether the AMI remained in force and effect. CR:479-528, Supp. CR 1:4-24. The trial court denied Burlington's motion and granted the PetroMax Defendants' motion, ruling that Burlington does not own any interest in the AMI and that the AMI had terminated.[10] CR:1617-19. On a joint motion by all parties, the trial court severed the remaining claims into a separate lawsuit in order to render its summary-judgment ruling final. CR:1640-45. Burlington then filed this appeal.

---

[10] *See* Appendices B & C attached hereto.

## SUMMARY OF THE ARGUMENT

The sole issue in this appeal is whether the 1994 Assignment conveyed certain oil and gas leases or only four oil wells and not the underlying leases. If it conveyed the described leases, as the trial court determined, the 1975 AMI agreement on which Burlington's claims rely terminated, and Burlington's claims cannot stand.

The Assignment on its face is unambiguously the sale of leases, including the wells thereon, and not just the sale of individual wells separated from their underlying leases. The Assignment explicitly sells and conveys "[t]he oil and gas leases . . . particularly described on Exhibit 'A'." In turn, Exhibit A particularly describes the leases subject to the sale. This language could not be clearer, and certainly would not have been used if the intention were to sell only particular wells and not the underlying leases.

The Assignment also expressly conveys "[t]he wells . . . on the Leases." Exhibit A lists four such associated wells, but this does not purport to be an exclusive list of all the wells subject to the sale; it does not restrict the conveyance to those four wells or deny conveyance of all other wells on the leases. To the contrary, only a few wells were excepted from the sale. This was done pursuant to the Assignment's reservation clause, which reserved "from the Interests those certain . . . interests . . . as specifically noted and reflected on Exhibit 'A'." The

8

only such reservation specifically noted and reflected on Exhibit A was the explicit exception of the wells in the "Less and Excepted" clause.

This contractual language can have only one meaning. The Assignment conveys the oil and gas leases particularly described on Exhibit A in their entirety, including the four listed associated wells and all other wells on those leases, subject only to the explicit exception of the specifically noted wells in the "Less and Excepted" clause.

Burlington's contrary interpretation departs from the Assignment's plain language and logical structure. Burlington's argument, which rests on speculation and empty theorizing about extrinsic historical facts, is wholly without merit.

## I. PRINCIPLES OF CONTRACT CONSTRUCTION.

The dispute in this case turns on the interpretation of the Assignment. The construction and interpretation of an unambiguous contract is a question of law for the Court. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 664 (Tex. 2005) (construing an oil and gas operating agreement); *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999). Whether a contract is ambiguous is a question of law for the Court. *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996); *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). The Supreme Court recently summarized the proper approach to contract construction:

> In construing a contract, we must ascertain and give effect to the parties' intentions as expressed in the writing itself. In discerning the parties' intent, "we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." We begin our analysis with the contract's express language. If we determine that the contract's language can be given a certain or definite legal meaning or interpretation, then the contract is not ambiguous and we will construe it as a matter of law. But, "if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent."

*El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 805-06 (Tex. 2012) (internal citations and quotations omitted). In this case, the Assignment can be given a certain and definite legal meaning, and there is only one reasonable interpretation.

## II.    THE ONLY REASONABLE INTERPRETATION OF THE ASSIGNMENT.



Supp. CR 1:64.

The Assignment begins with a very broad grant. Specifically, it states that Southland [Assignor] "does hereby assign, transfer, grant, and convey unto Samson [Assignee] all of Assignor's right, title and interest in and to the following:"

(i) The "oil and gas leases" described on Exhibit A, including all the rights and interests that normally accompany a lease, which is defined as the "Leases."

(ii) The wells and equipment on the Leases.

(iii) All the agreements related to, or affecting, the Leases.

(iv) The Assignor's rights to certain revenues or gas attributable to Assignor's interest in the Leases.

The sum total of these four subsections is then defined as the "Interests."

The Assignment also has a narrow reservation clause excepting from transfer only those certain interests "specifically noted and reflected on Exhibit 'A'." Supp. CR 1:64.

11

The first thing Exhibit A does, right at the top, is describe four leases:



Supp. CR 1:68. This list of the four leases being assigned corresponds to clause (i) in the granting clause of the Assignment. Supp. CR 1:64, 68. Exhibit A also includes a list of the key wells associated with these leases, set out at the bottom of the exhibit, under the heading "Associated Wells." *Id.* That list corresponds to clause (ii) of the granting clause of the Assignment. Supp. CR 1:64, 68. Finally, the "Less and Excepted" clause in Exhibit A identifies specific wells as exempted from the Assignment and corresponds to the Assignment's reservation[11] clause. *Id.*

Numbered paragraph 1 of the Assignment sets forth an extensive obligations/indemnity provision. Supp. CR 1:65. Pursuant to that provision, Samson (the assignee) agreed to

---

[11] Texas courts have long recognized that while there is a distinction between a reservation and an exception in a deed, the "terms are frequently used interchangeably and indiscriminately." *King v. First Nat'l Bank of Wichita Falls*, 192 S.W.2d 260, 262 (Tex. 1946); *see also Pich v. Lankford*, 302 S.W.2d 645, 650 (Tex. 1957) ("The words 'exception' and 'reservation' are not strictly synonymous . . ., but they are often used interchangeably."). It was Burlington itself that pointed this out to the trial court in its summary judgment briefing. CR:516.

VOL. 417 PAGE 710

1. This Assignment is accepted subject to, and Assignee agrees to assume and perform, any and all of the liabilities and obligations, or alleged or threatened liabilities and obligations, of Assignor under the Interests and existing oil and gas leases, assignments, operating agreements, product purchase and sale contracts, leases, permits, rights-of-way, licenses, easements, options, orders, and any other agreements or contracts attributable to and affecting the Interests, including but not limited to, any and all obligations (i) to pay and deliver royalties, overriding royalties, non-participating royalties, and other burdens on production, (ii) in connection with or arising out of balancing of overproduction or underproduction from the Interests, and (iii) in compliance with all laws and governmental regulations with respect to the Interests including, but not limited to, the lawful plugging and abandonment of oil and gas wells and the restoration of the surface of the land as nearly as possible to its prelease condition, whether or not such liabilities and obligations, or alleged or threatened liabilities and obligations, are caused by Assignor's negligence and whether or not such liabilities and obligations, or alleged or threatened liabilities and obligations, arise during the period of, or from, or in connection with Assignor's ownership or operation of the Interests. Without limitation of the foregoing, Assignee agrees to assume and perform any and all of the liabilities and obligations, or alleged or threatened liabilities and obligations, of Assignor for claims, losses, damages, costs, expenses, diminutions in value, suits, and causes of action of any kind or character, with respect to the environmental condition of the Interests, regardless of when the events occurred that caused such condition to exist and whether or not caused by or attributable to Assignor's negligence. Assignee shall, to the fullest extent permitted by law, protect, defend, indemnify and hold Assignor and its directors, officers, employees, agents and representatives of each of them, harmless from and against any and all claims, losses, damages, costs, expenses, diminutions in value, suits, causes of action or judgments of any kind or character with respect to any and all liabilities and obligations or alleged or threatened liabilities and obligations, including, but not limited to, any interest, penalty and any attorneys' fees and other costs and expenses incurred in connection with investigating or defending any claims or actions, whether or not resulting in any liability, attributable to or arising out of (i) ownership or operation of the Interests subsequent to the Effective Date, and (ii) Assignee's assumption of any liability or obligation in accordance with this paragraph.

THE INDEMNIFICATION, RELEASE AND ASSUMPTION PROVISIONS PROVIDED FOR IN THIS ASSIGNMENT SHALL BE APPLICABLE WHETHER OR NOT THE LOSSES, COSTS, EXPENSES AND DAMAGES IN QUESTION AROSE SOLELY OR IN PART FROM THE GROSS, ACTIVE, PASSIVE OR CONCURRENT NEGLIGENCE, OR OTHER FAULT OF ASSIGNOR.

*Obligations/Indemnity Clause*

assume and perform, any and all obligations and all of the liabilities ... of [Southland] under the *Interests* and existing oil and gas leases....

Furthermore, Samson agreed to

protect, defend, indemnify, and hold [Southland] harmless from and against any and all claims losses, damages ... attributable to or arising out of (i) ownership or operation of the **Interests** subsequent to the Effective Date, and (ii) [Samson's] assumption of any liability or obligation in accordance with this paragraph.

Supp. CR. 1:65 (emphasis added). Because the term "Interests" was defined to include all the Leases particularly described on Exhibit A, the wells and equipment on the Leases, the agreements related to the Leases, and certain revenues related to the Leases, Supp. CR 1:64, this indemnity provision further demonstrates that Samson was acquiring all of Southland's ownership interests with respect to those leases, subject only to the narrow reservations clause.

In short, Southland conveyed *all that it had* related to the Interests to Samson, and Samson accepted responsibility for it. Samson would not have accepted responsibility for the operations on, and the liabilities of, the leases if it

13

was not receiving ownership of the leases. Nor would Samson have agreed to indemnify Southland for claims arising from ownership of, or operations on, the leases unless ownership of the leases was being transferred to it.

The PetroMax Defendants' reading of the Assignment is the only construction that conforms to the agreement's plain language and logical structure. Moreover, it harmonizes and gives meaning to each provision—the granting clause, the reservation clause, the obligations/indemnity clause, the "Less and Excepted" clause, and the "Associated Wells" listing. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) (courts must examine the entire writing in an effort to harmonize and give effect to all provisions). The Assignment can be given a definite legal meaning. The granting clause states that Southland is conveying all the leases described on Exhibit A, reserving only what is specifically noted and reflected as being reserved. Exhibit A describes the four leases being conveyed and refers to four associated wells on the leases, reserving only the specifically identified wells in the "Less and Excepted" clause. There is no ambiguity. *Kachina Pipeline Co., Inc. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015).

## III. BURLINGTON'S CONSTRUCTION IS NOT REASONABLE.

Burlington's purported reading of the Assignment rests on a false premise. It argues that because Exhibit A has two lists, one of oil and gas leases and another of associated wells, one list must identify conveyed interests while the other list

14

identifies reserved interests. Appellant's Brief at 11-12. This is a strained misreading that ignores the Assignment's language and logical structure. The two lists in Exhibit A correspond to clauses (i) and (ii) of the Assignment's granting clause. Supp. CR 1:64, 68. Both lists identify conveyed interests. The first list on Exhibit A "particularly described" the "oil and gas leases" being conveyed pursuant to clause (i) of the Assignment; the second list identifies four of the "wells . . . on the Leases" that are explicitly included in the conveyance pursuant to clause (ii) of the Assignment. *Id.* The reserved interests subject to the Assignment's reservation clause are then separately identified in the "Less and Excepted" addendum to the list of the leases being conveyed. *Id.* There is nothing difficult about this straightforward reading of the Assignment and its Exhibit A.

Even so, Burlington argues that its contrary interpretation of the Assignment—that only the four "Associated Wells" were assigned and no leases—is the only reasonable interpretation, or is at least as reasonable as the interpretation of the PetroMax Defendants. Appellant's Brief at 29-30. But it is not. An assignment conveying only four specific wells would never have been drafted in the manner of the 1994 Assignment, with its primary focus on leases (including the Odom lease, where none of the four "Associated Wells" was located).

## A.    Burlington's Construction Requires Ignoring Essentially All of the Granting Clause.



Supp. CR 1:64.

The Assignment clearly states that Southland is assigning the "oil and gas leases ... described on Exhibit 'A'." Supp. CR 1:64. In turn, Exhibit "A" describes four leases. Supp. CR 1:68. The granting clause goes so far as to define these leases, and all rights, wells, equipment, and agreements attendant to them, as the "Leases." Supp. CR 1:64. In fact, the granting clause uses some form of the term "lease" no fewer than fourteen times. *Id.* Burlington's construction requires the Court to ignore all of this because, according to Burlington, the reservation clause essentially nullifies the entire granting clause rendering it effectively surplusage.    Rather, according to Burlington, Southland was not assigning any leases, only four wellbores.

Burlington's argument that "Leases" actually means "wells" defies credibility. If the intention really had been to assign just four wellbores, surely the granting clause would not have looked anything like it does.

**B.** **Burlington's Construction Makes No Sense in Light of the Obligations/Indemnity Clause.**

In the obligations/indemnity clause, Samson agreed to assume and perform all of Southland's liabilities and obligations in the *Interests.* Supp. CR 1:65. Furthermore, Samson agreed to indemnify Southland for any claims, liabilities, or obligations arising out of ownership or operation of the *Interests.* *Id.*

"Interests" is a defined term in the Assignment. It includes

(i) the leases described on Exhibit A (defined as the "Leases");

(ii) the wells and equipment on the Leases;

(iii) all agreements related to the Leases; and

(iv) certain revenues related to the Leases.

Supp. CR 1:64. Moreover, the definition of "Interests" is not diminished or curtailed in any way by the reservation clause. *Id.* Hence, when Samson agreed to these obligations, it agreed to them with respect to all of the leases described in Exhibit A—the Odom, the Gibbs, the Wilson, and the Buchanan. Supp. CR 1:65, 68.

If all that Samson received in this Assignment was four specific wellbores, and not the Leases themselves, it would make no sense for Samson to assume the obligation to perform under the Leases and to indemnify Southland for claims

17

arising out of the ownership or operation of the Leases. It makes even less sense given that none of the Associated Wells was on the Odom Lease. Supp. CR 2:12; RR 36. Why would Samson agree to *any* obligations with respect to the Odom Lease when it was not receiving *any* well or other interest from that lease?

The only reasonable construction is that Southland was assigning to Samson all of its interests in the Leases and saying—it is your baby now.

**C. Burlington's Construction Does Not Explain Why Exhibit A Would Switch the Order From the Text, or Adequately Explain What "Associated Wells" Is Supposed to Mean.**

This agreement was an assignment. Hence, it is hardly any surprise that the text of the Assignment starts off, right out of the box, with a description of what is being assigned. Supp. CR 1:64. Only after describing what is being assigned does the text of the Assignment discuss what is being reserved. *Id.*

One might expect that Exhibit A would follow the same structure. But, according to Burlington, the drafters of the Assignment, for some unexplained reason, and without identifying what they were doing, switched the order[12] in Exhibit A. Hence, according to Burlington, this is how the Assignment is to be construed:

---

[12] The PetroMax Defendants contend that the leases described at the top of Exhibit "A" were being assigned, including the wells on those leases, specifically including the "Associated Wells" identified in the Exhibit. The wells being reserved from the Assignment were identified in the "Less and Excepted" addendum immediately below the descriptions of the leases being assigned.



Supp. CR 1:64, 68.

But it makes no sense that the drafters of the Assignment would switch the order from the text of the Assignment to Exhibit A. Moreover, it makes no sense that in an *assignment*, Exhibit A would focus on, and place front and center, not what was being assigned, but rather what was being reserved.

Also, if the intent were to assign just the four wells, why would Exhibit A list those four wells at the bottom of the exhibit in what looks like a footnote under the heading "Associated Wells"? Why not call them "Assigned Wells" if that were the intent? And why not list them first?

Finally, Burlington's explanation of what those wells were "associated" with is inadequate. According to Burlington, they were not "associated" with anything referenced in the Assignment itself. Rather, Burlington contends that they were "associated" with an auction that is nowhere identified in the Assignment.

19

Appellant's Brief at 32. The PetroMax Defendants' construction, that these key[13] wells were "associated" with the leases to be assigned, described three-inches up the page on Exhibit A, is the only reasonable interpretation.

### D. Burlington Does Not Explain Why It Would Be Necessary to Reserve the Odom Lease.

Supp. CR 1:68.

According to Burlington, the four leases described at the top of Exhibit A were being reserved, and only the four "Associated Wells" listed at the bottom were being conveyed. But not a single one of those four wells was on the Odom Lease. Supp. CR 2:12; RR 36. Hence, why would it be necessary to reserve the

---

[13] Burlington argues that this list of "Associated Wells" could not have been a list of *all* wells on the identified leases because it did not identify the Wilson #1 Well. Appellant's Brief at 26. But this listing was not intended to be a listing of *all* wells. Rather, it was only a listing of the key wells associated with the leases. The Wilson #1 well was subject to a 600% after payout penalty when Southland went non-consent. *Id.* at 33; CR:1417. Hence, it might never have had any value.

20

Odom Lease when it was not implicated by what was being conveyed? Burlington does not even attempt to address this question.

**E.  Burlington's Construction Renders the "Less and Excepted" Clause Essentially Meaningless, or Completely Misleading.**



Supp. CR 1:68.

Burlington argues that the "Less and Excepted" clause is not a true reservation because the assignor had no continuing ownership in the wells identified in that clause. Appellant's Brief at 24. That is a trivial debating point that ignores the substance of what the parties to the Assignment were doing. Southland reserved, or excepted, the named wells in the "Less and Excepted" clause precisely because it no longer owned them and therefore was unable to convey them.

Burlington's argument with regard to this point rests in its entirety on the boilerplate language "reserves and *retains unto itself.*" *Id.*; Supp. CR 1:64. To be sure, the assignor could not retain an interest it had already lost or conveyed away,

21

but Southland did, in fact, continue to own an interest in these wells—a 5% override. Supp. CR 1:126-34; Supp. CR 2:571-74. Burlington ignores this undisputed evidence. Southland did retain unto itself an interest in those wells that was excepted from the Assignment.[14] However, even if Southland had not continued to own that interest, the boilerplate phrase—retains unto itself—is merely a lawyer's unnecessarily elaborate way of saying "excepts from transfer." It would be nonsensical to read that phrase, as Burlington apparently does, to deny a seller the power to exclude from the terms of a sale a property it no longer owns.

Moreover, Burlington's argument just does not make sense. Essentially, Burlington argues that the particularized list of leases itself must be the reservation, and that the only purpose of the "Less and Excepted" clause was to clarify what was not included in the leases that were being reserved. Appellant's Brief at 24. But it would not be necessary to clarify what *was not* included in leases that *were not* being assigned. Rather, this provision was only necessary to clarify what *was not* included in what *was* being assigned, which was the leases listed "above."

---

[14] Southland sold this interest to Tri-Union in a subsequent transaction. Supp. CR 1:170-75; Supp. CR 2:691-92. An internal Southland email states that the purpose of this transaction was to sell the remainder of Southland's interest in the original leases. CR:2015. Thus, the fact that this 5% override was the only interest sold to Tri-Union is consistent with the conclusion that the 1994 Assignment conveyed Southland's interest in the four leases, not just the specific wells.

In fact, if the drafters of this Assignment were "less and excepting" something from interests that were being reserved, then the logical conclusion would be that the wells identified in the "Less and Excepted" clause were, in fact, being assigned. But Burlington itself admits that those wells were not subject to conveyance under the Assignment.

**F.     The Leases Cannot Be What Was Reserved Because They Cannot Be "From" the Wells.**



Supp. CR 1:64.

The granting clause defines the term "Interests" to include (i) the Leases described on Exhibit A; (ii) the wells and equipment on the Leases; (iii) all

23

agreements related to the Leases; and (iv) certain revenues related to the Leases. The reservation clause then states that what is reserved is "from the Interests." Supp. CR 1:64.



Supp. CR 1:68.

Burlington's construction is that what was assigned was the four "Associated Wells" listed at the bottom of Exhibit A and what was reserved is the four leases at the top. But that simply cannot work. For instance, because none of the "Associated Wells" are on the Odom Lease, the Odom Lease cannot be "from" the "Associated Wells." More generally, however, the leases are broader than just the four "Associated Wells." While the "Associated Wells" could be "from" the leases, the leases could not be "from" the "Associated Wells." As an analogy, Texas can be "from" the United States, but the United States cannot be "from" Texas.

In the end, the Assignment rather clearly says that Southland was conveying to Samson the "Leases" described in Exhibit A, and all that normally comes with leases. Burlington spent a mountain of ink trying to convince the trial court that, even though the Assignment did in fact say this in the granting clause, it took it all away in the reservation clause and all that was conveyed was four specific wells. The trial court properly rejected Burlington's construction, though, because it is unreasonable. It makes a mockery of the Assignment's structure, is at odds with its language, and renders various provisions of the Assignment either meaningless or nonsensical.

## IV. PAROL EVIDENCE CANNOT BE USED TO ALTER THE PLAIN MEANING OF THE ASSIGNMENT AND DOES NOT CHANGE THE EQUATION IN ANY EVENT.

"In construing a contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *J.M. Davidson*, 128 S.W.3d at 229. "'In the usual case, the instrument alone will be deemed to express the intention of the parties for it is the objective, not subjective, intent that controls.'" *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 n.25 (Tex. 2011) (quoting *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981)); *Matagorda Cnty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006). If a "contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous." *Kachina Pipeline Company, Inc. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (internal

25

quotations omitted).  Moreover, the "parol-evidence rule precludes considering evidence that would render a contract ambiguous when the document, on its face, is capable of a definite legal meaning." *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014).

The rule does not prohibit consideration of surrounding circumstances that aid in the construction of the contract's language by showing context.  *Sun Oil,* , 626 S.W.2d at 731; *Houston Exploration*, 352 S.W.3d at 469.  However, there are limits.  *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011).  While

> [u]nderstanding the context in which an agreement was made is essential in determining the parties' intent *as expressed in the agreement*, [] it is the parties' expressed intent that the court must determine.  Extrinsic evidence cannot be used to show that the parties probably meant, or could have meant, something other than what their agreement stated.

*Id.* (emphasis in original).  Hence, the Court can only consider "surrounding circumstances that inform, rather than vary from or contradict, the contract text." *Houston Expl.*, 352 S.W.3d at 469.

## A.    The Alleged Evidence of "Surrounding Circumstances."

### 1.    The Auction Catalog.

In this case, Burlington urges the Court to consider an auction catalog as evidence of surrounding circumstances.  Appellant's Brief at 12, 23, & 33.  But there is only one reasonable interpretation of the Assignment and it can be given a

definite legal meaning. Specifically, the Assignment conveyed four leases to Samson with limited exceptions. Burlington cannot resort to extrinsic evidence of surrounding circumstances to create an ambiguity, or vary or contradict the text. *Id.*

Moreover, consideration of this catalog does not aid in the construction of the Assignment. The catalog is a hearsay marketing brochure developed by a third party, based on information provided by numerous sellers that the clearinghouse did not purport to verify, over two decades ago. CR:1445-1523. It simply does not, by itself, provide sufficient context of anything. It certainly does not, for instance, support Burlington's construction of the Assignment.

Essentially, Burlington notes that the auction catalog, which listed some 500 oil and gas properties for sale from multiple sellers, listed four Southland wells—the Gibbs Bros. #1, Wilson #3, Wilson #2, and Buchanan #1. Because the catalog only listed these wells, and does not reference the leases on which the wells were situated, Burlington argues that this must mean that only those four wells were up for auction, and not any Southland leases. Appellant's Brief at 27. Burlington further reasons that because there is a header on the first page of the Assignment identifying those wells, and they are listed on Exhibit A under the heading "Associated Wells," that must mean that those four wells were *all* that was conveyed in the Assignment. Appellant's Brief at 12, 23, & 27-28; Supp. CR 1:64, 68.

Burlington's syllogism does not work. First, neither this Court, nor Burlington, nor the auction participants themselves, can/could rely on the catalog as providing a completely accurate description of what was being sold. For instance, the catalog made the following disclaimers:

## ATTENTION BIDDERS

 PLEASE READ BEFORE BIDDING

- Do not bid solely on the basis of the information contained in this Auction Catalog. The information contained herein, and any other data or information previously published or furnished by The Clearinghouse or the Seller, is provided as a convenience to the Bidder solely for the purpose of determining the order in which properties will be sold.

- All information is provided without warranty, express or implied, as to accuracy, completeness or correctness and should be independently verified by the Bidder prior to bidding.

### ★★ REMEMBER ★★
There is no substitute for talking with the Seller, other partners, the Operator, and the purchasers of production. Verify information through independent sources before bidding.

CR:1453-54. Moreover, the bottom of every page of property listings in the catalog bore the following disclaimer:

28

This catalog is provided for convenience purposes only. All Information is provided without warranty as to accuracy or completeness. Bidders should verify all information and the condition of properties being sold prior to bidding.

CR:1459.

Instead, the catalog stated that there would be copies of the sale documents at the auction for review prior to the bidding. CR:1446.

**ASSIGNMENTS**

Conveyancing documents are generally available for review in advance of the Sale. These instruments should be thoroughly reviewed, paying special attention to any restrictions, requirements or terms which may or may not be announced.

The message was clear. It would be the sale documents the sellers would bring to the auction that would control what was actually sold, not the auction catalog. Indeed, Southland executed and notarized the Assignment on September 9, 1994—five days prior to the auction. Supp. CR 1:66-67. Moreover, Brian Exline, who executed the Assignment on behalf of Samson, testified that he reviewed the Assignment prior to making the purchase, and Samson executed the Assignment on the day of the auction. Supp. CR 1:66; Supp. CR 2:1364.

Another problem is that Burlington's argument assumes that when the catalog listed the wells, and not the underlying leases, that meant that the wells would be sold separately from the leases. But in actual fact, multiple listings in the catalog identified significant numbers of wells for sale as being "WBO" or "Wellbore Only." *See, e.g.*, CR:1467, 1475-77, 1485, 1489-95, 1498, 1508-09,

29

1512-13, and 1515-19. That was not the case with the wells at issue here, suggesting that more than just the wells would be sold. CR:1497.

Indeed, that was confirmed by the testimony of Brian Exline who, in 1994, was employed by Samson, the purchaser, as a Supervisor—Special Projects. Supp. CR 2:1362. In that capacity, he executed the Assignment on Samson's behalf. Supp. CR 1:66. He testified that Wellbore Only properties sell for less than those that include the leasehold. Supp. CR 2:1364-65. He further testified that had these properties been Wellbore Only, Samson may not have purchased them. *Id.* But the auction catalog does not list them as being Wellbore Only. *Id.*; CR:1497. In fact, Exline confirmed that he reviewed the Assignment prior to the purchase and concluded that it was not a Wellbore Only assignment. Supp. CR 2:1364-65. Most importantly, however, Exline understood that the Assignment "convey[ed] the wells and the leases with only a limited exclusion." *Id.* at 1365.

### 2. The Understanding of the Purchaser and Seller.

In the end, perhaps the best evidence of the surrounding circumstances to this sale of oil and gas interests is the understanding of the buyer and the seller. These are not the subjective opinions of interested parties to the litigation. Neither Samson nor Southland has any dog in this fight. And Southland clearly believed it sold, and Samson clearly believed it purchased, the four leases described on Exhibit A, and all their wells and equipment and related agreements, save for the

30

specific wells set out in the "Less and Excepted" carve-out.  Supp. CR 2:1363-64; Supp. CR 1:115.

It may have been that the four "Associated Wells"—the Gibbs Bros. #1, Wilson #3, Wilson #2, and Buchanan #1—were what got Samson's attention and made it interested in the purchase.  But that does not mean that Samson would not have been interested in acquiring the underlying leases on which those wells were situated.  Moreover, it may be that, because these were the important wells underlying the purchase, the drafters of the Assignment, in an abundance of caution, listed those four wells in a tag line on the front page of the Assignment and in the "Associated Wells" clause at the bottom of Exhibit A to make it abundantly clear that the these four wells were among the assets being conveyed. Supp. CR 1:64, 68.  It was twenty-one years ago and we may never know.

But the point is, both Samson and Southland, the actual participants in the transaction, were aware of the auction catalog at the time of sale.  Despite this, they interpreted the Assignment as assigning the four leases described in Exhibit A, and not just the four "Associated Wells."  If this evidence of "surrounding circumstances" did not aid the parties to the transaction in reaching the interpretation Burlington now places on the Assignment, it is hard to see how it could aid this Court in arriving at that interpretation.

In short, the Assignment unambiguously states that Southland was conveying the leases described on Exhibit A to Samson, and both Samson and Southland believed that the auction catalog was consistent with that proposition. Hence, the auction catalog provides no support whatsoever for disturbing the trial court's proper construction of the Assignment.

## B.    The Post-Transaction Parol Evidence.

The confused history of the parties' understandings or misunderstandings long after the execution of the Assignment[15] can shed no light on the proper construction of the 1994 Assignment.

Basically, the PetroMax Defendants, based on the faulty Jircik title opinion, took actions, over a period of several years, consistent with the understanding that Burlington owned an interest in the Wilson Lease. However, a title opinion is not proper evidence in the consideration of an unambiguous contract or deed. *Garza v. Prolithic Energy Co., L.P.*, 195 S.W.3d 137, 146 (Tex. App.—San Antonio 2006, pet. denied).

For its part, Burlington, relying on the land files from Southland and subsequent parties in Burlington's chain of title, took the position, over a period of

---

[15] Southland and Samson executed this Assignment in 1994. The confusion that is the subject of the post-Assignment parol evidence is dated long after 1994 and relates to parties other than Southland or Samson.

years, that it did *not* own an interest in the Wilson Lease. *See* Supp. CR3:308, 310, 312, 314-15.

After the success of the wells drilled by PetroMax, Burlington suddenly got motivated. It re-examined everything, abandoned its long-held position, and then espoused the position the PetroMax Defendants originally advanced based on the faulty Jircik title opinion. This prompted the PetroMax Defendants to re-examine everything, abandon their initial position, and espouse Burlington's initial position.

In the end, the Court should ignore the post-contract actions of both sides to this dispute. While this history may shed light on why Burlington filed this action, it sheds no light on, and cannot change, the unambiguous meaning of the Assignment. *In re Dillard Dept. Stores, Inc.*, 186 S.W.3d 514, 515 (Tex. 2006) ("The objective intent as expressed in the agreement controls the construction of an unambiguous contract, not a party's after-the-fact conduct."). The Assignment is unambiguous, and the parol evidence rule precludes consideration of the post-contract conduct of both sides. *Americo Life*, 440 S.W.3d at 22.

C. **This Court Should Not Rely on Parol Evidence in Construing a Deed.**

The Assignment is a title document filed of record in the Madison County Clerk's office. Supp. CR. 1:64. Although some courts have consulted evidence of surrounding circumstances in construing an unambiguous deed, "the majority of deed and mineral deed cases clearly prefer the route of using other canons and not

extrinsic evidence or surrounding circumstances to ascertain the intent of the parties." Bruce M. Kramer, *The Sisyphean Task of Interpreting Mineral Deeds and Leases: An Encyclopedia of Canons of Construction*, 24 TEX. TECH L. REV. 1, 14 (1993). There is an important policy reason for this: "Title examiners would no longer be able to rely on the written word. Individual adjudication of deeds would lead to disparate results depending on factors extraneous to the instrument." *Id.* at 19.

In this case, relevant canons of construction include the following:

- The assignment should be interpreted to convey the greatest possible estate. *See Day & Co., Inc. v. Texland Petroleum, Inc.*, 786 S.W.2d 667, 668 (Tex. 1990).

- Uncertain reservations or exceptions fail. *See Lewis v. Midgett*, 448 S.W.2d 548, 551-52 (Tex. Civ. App.—Tyler 1969, no writ).

- The assignment must be construed against Burlington (the grantor) and in favor of Samson (the grantee). *See Gonyea v. Kerby*, No. 10-12-00182-CV, 2013 WL 4040117, at *3 (Tex. App.—Waco Aug. 8, 2013, pet. denied); *State v. Dunn*, 574 S.W.2d 821, 824 (Tex. Civ. App.—Amarillo 1978, writ ref'd n.r.e.).

Each of these canons of construction supports the construction of the PetroMax Defendants that the Assignment conveyed the four leases described in Exhibit A, not just the four wells under the "Associated Wells" heading.

## V. BURLINGTON IS NOT ENTITLED TO JUDGMENT ON ITS 25% ISSUE.

Burlington also seeks rendition of a judgment that it is entitled to be offered the full 25% interest that Buttes agreed to offer to Aztec in the 1975 Letter Agreement, even though Burlington at most owns only a fraction of Aztec's original interest. Appellant's Br. at 34-35. The trial court denied Burlington's motion on this issue. *See id.* at xii (Burlington's Issue 2 asks: "Did the trial court err in denying Burlington summary judgment on this issue?"); CR:1618.

This issue is not properly here. Appellate courts normally do not review denials of summary judgment. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625 (Tex. 1996). This rule has an exception for cases where the parties file cross-motions on the same issue. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). But the PetroMax defendants did not file a cross-motion on this issue (Supp. CR 1:8), so the exception does not apply. *See Mitchell v. Mitchell*, 445 S.W.3d 790, 801 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ("[T]he cross-motion exception is inapplicable . . . because the parties did not move for summary judgment on the same issue . . . ."). The Court should decline to reach the issue.

This issue will not arise at all if the Court rejects Burlington's Issue 1, as it should. But even if Burlington were to prevail on Issue 1, the procedural posture of the case would still make it inappropriate for the Court to reach Issue 2.

35

Finally, and in any event, Burlington's argument in this regard lacks merit. In the 1975 Letter Agreement, Buttes agreed to offer Aztec 25% of interests acquired in the AMI in the future. CR:593. Under Burlington's construction, every successor to Aztec would be entitled to be offered 25% of any interests acquired within the AMI by Buttes or its successors. This would require Buttes's successors to offer more than 25% of interests they acquire and would impermissibly change the terms of the 1975 Letter Agreement. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 161 (Tex. 2003) (holding that courts "may neither rewrite the parties' contract nor add to its language"); *Capitan Enters., Inc. v. Jackson*, 903 S.W.2d 772, 776 (Tex. App.—El Paso 1994, writ denied) (holding that rights of non-assigning party "are neither enhanced nor diminished by the assignment").

Burlington's construction is unreasonable and even absurd. There are more than five assignees of Aztec's interests in the land covered by the AMI (including Defendant Woodbine). Supp. CR 3:2147-2763. Under Burlington's construction, Defendant Woodbine would be required to offer itself 25% of any interest that it acquires. Moreover, Burlington's construction would require each of Aztec's successors to be offered 25% of any interest acquired by a successor to Buttes, which would be mathematically impossible. *See Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 313 (Tex. 2005) (rejecting a construction of a contract that would be unreasonable, inequitable, and oppressive).

36

## PRAYER FOR RELIEF

The trial court properly construed the unambiguous Assignment. In that Assignment, Southland conveyed the leases described in Exhibit A, along with their wells, equipment, and related agreements, to Samson, save for a narrow exception not relevant here. That is the only reasonable interpretation of the Assignment. Accordingly, Burlington has no interest in the Gibbs, Wilson or Buchanan leases. Consequently, there are no longer any leases jointly owned between the parties to the 1975 Letter Agreement, and the AMI created by that agreement expired. Hence, Burlington's claims, which all depend upon the continued existence of the AMI, have no basis. The Court should affirm.[16]

---

[16] Should the Court determine that the Assignment is ambiguous, it should remand. Likewise, should the Court somehow determine that Burlington's construction of the Assignment is the only reasonable construction, it should also remand in light of the numerous affirmative defenses asserted by the PetroMax Defendants, which the court below had no occasion to consider.

Respectfully submitted,

BECK REDDEN LLP

By: */s/ David M. Gunn*
    David J. Beck
    State Bar No. 00000070
    dbeck@beckredden.com
    David M. Gunn
    State Bar No. 08621600
    dgunn@beckredden.com
    Thomas E. Ganucheau
    State Bar No. 00784104
    tganucheau@beckredden.com
    Jim Taylor
    State Bar No. 00788512
    jtaylor@beckredden.com
1221 McKinney, Suite 4500
Houston, TX  77010-2010
(713) 951-3700
(713) 951-3720 (Fax)
**Counsel for Appellees,**
**PetroMax Operating Co., Inc.,**
**Petro Texas LLC, and**
**CH4 Energy II, LLC**

CANTEY HANGER LLP

By: */s/ Brad D'Amico*
    Brad D'Amico
    State Bar No.00783923
    bd@canteyhanger.com
1999 Bryan Street, Suite 3300
Dallas, TX  75201
(214) 978-4100
(214) 978-4150 (Fax)

**Counsel for Appellee**
**PetroMax Operating Co., Inc.**

HANKINSON LLP

By: */s/ Deborah G. Hankinson*
    Deborah G.  Hankinson
    State Bar No. 00000020
    dhankinson@hankinsonlaw.com
    Stephanie Dooley Nelson
    State Bar No. 24002006
    snelson@hankinsonlaw.com
750 N. St. Paul St., Suite 1800
Dallas, Texas 75201
(214) 754-9190
(214) 754-9140 (Fax)


PIERCE & O'NEILL, LLP
    Jesse R. Pierce
    State Bar No. 15995400
    jpierce@pierceoneill.com
    Brian K. Tully
    State Bar No. 24039217
    btully@pierceoneill.com
4203 Montrose Boulevard
Houston, Texas 77006
(713) 634-3600
(713) 634-3601 (Fax)

***Counsel for Appellee***
***TexCal Energy South Texas, L.P.***

39

THOMPSON & KNIGHT LLP

By: */s/ Greg W. Curry*
    Greg W. Curry
    State Bar No. 05270300
    greg.curry@tklaw.com
    Richard B. Phillips, Jr.
    State Bar No. 24032833
    rich.phillips@tklaw.com
    Gregory D. Binns
    State Bar No. 24027148
    greg.binns@tklaw.com
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1700
(214) 969-1751 (Fax)


ATCHLEY, RUSSELL, WALDROP
    & HLAVINKA, LLP
    Jeffery C. Lewis
    State Bar No. 12280950
    jlewis@arwhlaw.com
1710 Moores Lane
Texarkana, Texas 75503
(903) 792-8246
(903) 792-5801 (Fax)

***Counsel for Appellee***
***Woodbine Acquisition, LLC***
***n/k/a MD America Energy LLC***

40

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2015, a true and correct copy of the above and foregoing Brief was forwarded to all counsel by the Electronic Service Provider, if registered, otherwise by email, as follows:

Kirsten M. Castañeda
kcastaneda@adjtlaw.com
ALEXANDER DUBOSE JEFFERSON
 & TOWNSEND LLP
4925 Greenville Avenue, Suite 510
Dallas, TX 75206

John R. Mercy
jmercy@texarkanalawyers.com
MERCY CARTER TIDWELL, L.L.P.
1724 Galleria Oaks Drive
Texarkana, TX 75503

Vincent L. Marable III
trippmarable@sbcglobal.net
PAUL WEBB, P.C.
221 N. Houston Street
Wharton, TX 77488

Roger D. Townsend
rtownsend@adjtlaw.com
ALEXANDER DUBOSE JEFFERSON
 & TOWNSEND LLP
1844 Harvard Street
Houston, TX 77008

Fred Hagans
fhagans@hagans-law.com
Kendall C. Montgomery
kmontgomery@hagans-law.com
HAGANS BURDINE MONTGOMERY
 & RUSTAY, P.C.
3200 Travis, Fourth Floor
Houston, TX 77006

*Counsel for Appellant,*
*Burlington Resources Oil & Gas Company LP*


*/s/ David M. Gunn*
David M. Gunn

41

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Tex. R. App. P. 9.4 because it contains 7,589 words, excluding the parts of the brief exempted by Tex. R. App. P. 9.4(i)(2)(B).

2.     This brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14 point Times New Roman font.

Dated: <u>December 21, 2015</u>.

<u>/s/ David M. Gunn</u>
David M. Gunn
*Counsel for Appellees, PetroMax Operating Co., Inc., Petro Texas, LLC, and CH4 Energy II, LLC*

**No. 06-15-00044-CV**

IN THE SIXTH COURT OF APPEALS
TEXARKANA, TEXAS

BURLINGTON RESOURCES OIL & GAS COMPANY LP,
*Appellant,*

v.

PETROMAX OPERATING CO., INC., WOODBINE ACQUISITION, LLC,
PETRO TEXAS, LLC, CH4 ENERGY II, LLC, AND
TEXCAL ENERGY SOUTH TEXAS L.P.,
*Appellees.*

On Appeal from the 12th District Court, Madison County, Texas
Trial Court Cause No. 12-13130-012-10

APPENDIX

**Tab**

A   Assignment and Bill of Sale (Supp. CR 1:64-69)

B   Order Granting Defendants' Motion for Summary Judgment on Title Issues (CR 1617)

C   Order Denying Burlington's Motion for Partial Summary Judgment Seeking Various Declarations (CR 1618-19)

# Tab A

# Assignment and Bill of Sale
# (Supp. CR 1:64-69)

Well Name: BUCHANAN 1, GIBBS BROS. 1, WILSON JAMES 2 AND WILSON JAMES 3

**12235**

## ASSIGNMENT AND BILL OF SALE

STATE OF TEXAS        §
                      §           KNOW ALL MEN BY THESE PRESENTS THAT:
COUNTY OF MADISON     §

**SOUTHLAND ROYALTY COMPANY**, a Delaware Corporation, whose address is 400 N. Sam Houston Parkway East, Suite 1200, Houston, Texas 77060 ("Assignor"), for and in consideration of ONE HUNDRED DOLLARS ($100.00) and other good and valuable consideration, receipt of which is hereby acknowledged, does hereby assign, transfer, grant and convey unto ___Samson Resources Company___ whose address is ___Two West Second Street, Tulsa, OK 74103___ ("Assignee"), all of Assignor's right, title and interest in and to the following:

(i)    The oil and gas leases, leasehold interests, rights and interests attributable or allocable to the oil and gas leases or leasehold interests by virtue of pooling, unitization, communitization, and operating agreements, licenses, permits, and other agreements, all more particularly described on Exhibit "A" hereto, limited as to the lands and depths indicated on Exhibit "A" (collectively the "Leases"), together with identical undivided interests in and to all the property and rights incident thereto, including, but not limited to, all rights in, to and under all agreements, product purchase and sale contracts, leases, permits, rights-of-way, easements, licenses, farmouts, options, orders, and other contracts or agreements of a similar nature to the extent same relate to the Leases;

(ii)   The wells, equipment, materials and other personal property, fixtures and improvements on the Leases as of the Effective Date (as hereinafter defined), appurtenant thereto or used or obtained in connection with the Leases or with the production, treatment, sale or disposal of hydrocarbons or waste produced therefrom or attributable thereto, and all other appurtenances thereunto belonging (the "Equipment"); provided, however, Equipment shall not include vehicles, communications equipment, tools, warehouse stock, compressors or leased equipment located on the Leases;

(iii)  All unitization, communitization, pooling, and operating agreements, and the units created thereby which relate to the Leases or interests therein described on Exhibit "A" or which relate to any units or wells located on the Leases, including any and all units formed under orders, regulations, rules, and other official acts of the governmental authority having jurisdiction, together with any right, title and interest created thereby in the Leases; and

(iv)   All of Assignor's rights to claim revenues or gas resulting from any underproduction attributable to Assignor's interest in the Leases.

All of Assignor's interest in the above-mentioned assets is herein collectively referred to as the "Interests".

Assignor reserves and retains unto itself from the Interests those certain lands, leases, properties, interests, leasehold rights, depths or formations as specifically noted and reflected on Exhibit "A", and the right of joint use of any agreements assigned hereunder where needed for the exploration, development, and operation of any rights or acreage (either horizontally or vertically) retained by Assignor or where needed in order to exercise ancillary rights in, or for access to, adjoining or nearby properties owned by Assignor.

TO HAVE AND TO HOLD the Interests unto Assignee, its successors and assigns, forever, subject to the following terms and conditions:

SM:ASSIGNR.DOC
Revised 8/30/94

-1-

A True and Correct
Copy of Original
Filed in Madison
County Clerk's Office

1. This Assignment is accepted subject to, and Assignee agrees to assume and perform, any and all of the liabilities and obligations, or alleged or threatened liabilities and obligations, of Assignor under the Interests and existing oil and gas leases, assignments, operating agreements, product purchase and sale contracts, leases, permits, rights-of-way, licenses, easements, options, orders, and any other agreements or contracts attributable to and affecting the Interests, including but not limited to, any and all obligations (i) to pay and deliver royalties, overriding royalties, non-participating royalties, and other burdens on production, (ii) in connection with or arising out of balancing of overproduction or underproduction from the Interests, and (iii) in compliance with all laws and governmental regulations with respect to the Interests including, but not limited to, the lawful plugging and abandonment of oil and gas wells and the restoration of the surface of the land as nearly as possible to its prelease condition, whether or not such liabilities and obligations, or alleged or threatened liabilities and obligations, are caused by Assignor's negligence and whether or not such liabilities and obligations, or alleged or threatened liabilities and obligations, arise during the period of, or from, or in connection with Assignor's ownership or operation of the Interests. Without limitation of the foregoing, Assignee agrees to assume and perform any and all of the liabilities and obligations, or alleged or threatened liabilities and obligations, of Assignor for claims, losses, damages, costs, expenses, diminutions in value, suits, and causes of action of any kind or character, with respect to the environmental condition of the Interests, regardless of when the events occurred that caused such condition to exist and whether or not caused by or attributable to Assignor's negligence. Assignee shall, to the fullest extent permitted by law, protect, defend, indemnify and hold Assignor and its directors, officers, employees, agents and representatives of each of them, harmless from and against any and all claims, losses, damages, costs, expenses, diminutions in value, suits, causes of action or judgments of any kind or character with respect to any and all liabilities and obligations or alleged or threatened liabilities and obligations, including, but not limited to, any interest, penalty and any attorneys' fees and other costs and expenses incurred in connection with investigating or defending any claims or actions, whether or not resulting in any liability, attributable to or arising out of (i) ownership or operation of the Interests subsequent to the Effective Date, and (ii) Assignee's assumption of any liability or obligation in accordance with this paragraph.

   THE INDEMNIFICATION, RELEASE AND ASSUMPTION PROVISIONS PROVIDED FOR IN THIS ASSIGNMENT SHALL BE APPLICABLE WHETHER OR NOT THE LOSSES, COSTS, EXPENSES AND DAMAGES IN QUESTION AROSE SOLELY OR IN PART FROM THE GROSS, ACTIVE, PASSIVE OR CONCURRENT NEGLIGENCE, OR OTHER FAULT OF ASSIGNOR.

2. THIS ASSIGNMENT AND BILL OF SALE IS EXECUTED, DELIVERED, AND ACCEPTED WITHOUT ANY REPRESENTATION, WARRANTY OR COVENANT OF TITLE OF ANY KIND OR NATURE, EITHER EXPRESS, IMPLIED OR STATUTORY. THE INTERESTS ARE BEING CONVEYED AND ASSIGNED TO AND ACCEPTED BY THE ASSIGNEE IN THEIR "AS IS, WHERE IS" CONDITION AND STATE OF REPAIR, AND WITH ALL FAULTS AND DEFECTS, WITHOUT ANY REPRESENTATION, WARRANTY OR COVENANT OF ANY KIND OR NATURE, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MARKETABILITY, QUALITY, CONDITION, MERCHANTABILITY, AND/OR FITNESS FOR A PARTICULAR PURPOSE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED. IT IS UNDERSTOOD AND AGREED THAT ASSIGNEE SHALL ACCEPT ALL OF THE SAME IN THEIR "AS IS, WHERE IS" CONDITION AND STATE OF REPAIR AND WITH ALL FAULTS AND DEFECTS, INCLUDING, BUT NOT LIMITED TO, THE PRESENCE OF NATURALLY OCCURRING RADIOACTIVE MATERIAL (NORM). IN ADDITION, ASSIGNOR MAKES NO REPRESENTATION, COVENANT OR WARRANTY, EXPRESS, IMPLIED OR STATUTORY, AS TO THE ACCURACY OR COMPLETENESS OF ANY DATA DELIVERED TO ASSIGNEE WITH RESPECT TO THE INTERESTS, OR CONCERNING THE QUALITY OR QUANTITY OF HYDROCARBON RESERVES, IF ANY, ATTRIBUTABLE TO THE INTERESTS, OR THE ABILITY OF THE INTERESTS TO PRODUCE HYDROCARBONS, OR THE PRICES WHICH ASSIGNEE IS OR WILL BE ENTITLED TO RECEIVE FOR ANY SUCH HYDROCARBONS.

3. TO THE EXTENT APPLICABLE TO THE INTERESTS OR ANY PORTION THEREOF,

2

A True and Correct Copy of Original Filed in Madison County Clerk's Office

VOL 417 PAGE 711

ASSIGNEE HEREBY WAIVES THE PROVISIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT, CHAPTER 17, SUBCHAPTER E, SECTIONS 17.41 THROUGH 17.63, INCLUSIVE (OTHER THAN SECTION 17.555, WHICH IS NOT WAIVED), TEXAS BUSINESS & COMMERCIAL CODE.

4. This Assignment and Bill of Sale shall inure to the benefit of and be binding upon the parties hereto, their heirs, successors and assigns.

5. This Assignment and Bill of Sale may be executed by Assignor and Assignee in any number of counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, this instrument is executed the 9th day of September, 1994, but shall be effective as of the 1st day of September, 1994 (the "Effective Date").

ATTEST:

By:_____

**ASSIGNOR**
**SOUTHLAND ROYALTY COMPANY**

By:_____
Name: Kent Beers
Title: Attorney-in-Fact

**ASSIGNEE**
Samson Resources Company

ATTEST:

By:_____

By:_____
Name: Brian Exline
Title: Attorney in Fact

A True and Correct Copy of Original Filed in Madison County Clerk's Office

3

VOL 417 PAGE 712

STATE OF TEXAS     §
                      §
COUNTY OF HARRIS     §

      BEFORE ME, the undersigned authority, on this day personally appeared Kent Beers, Attorney-in-Fact for Southland Royalty Company, a Delaware Corporation, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed and in the capacity therein stated.

GIVEN UNDER MY HAND AND OFFICIAL SEAL OF OFFICE on this 9th day of September, 1994.



MY COMMISSION EXPIRES:

SUSAN J. SCOTT
NOTARY PUBLIC STATE OF TEXAS
MY COMMISSION EXPIRES
SEPT. 15, 1996

Notary Public in and for the State of Texas

## CORPORATION ACKNOWLEDGMENT

STATE OF TEXAS     §
                      §
COUNTY OF HARRIS     §

      BEFORE ME, the undersigned authority, on this day personally appeared _____, _____ of _____, known to me to be the person and officer whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed and in the capacity therein stated as the act and deed of said corporation.

      GIVEN UNDER MY HAND AND OFFICIAL SEAL OF OFFICE on this _____ day of September, 1994.

MY COMMISSION EXPIRES:

_____      Notary Public in and for the State of Texas

## ATTORNEY-IN-FACT

STATE OF TEXAS     §
                      §
COUNTY OF HARRIS     §

BEFORE ME, the undersigned authority, on this day personally appeared Brian Exline, Attorney-in-Fact for Samson Resources Company known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that she/he executed the same for the purposes and consideration therein expressed and in the capacity therein stated.

GIVEN UNDER MY HAND AND OFFICIAL SEAL OF OFFICE on this 14 day of September, 1994.

MY COMMISSION EXPIRES:



SANDRA G. BARKER
MY COMMISSION EXPIRES
December 1, 1997

Notary Public in and for the State of Texas

4

A True and Correct Copy of Original Filed in Madison County Clerk's Office

Page 1 of Exhibit

| CO FILE NO........ | TYPE INSTRUMENT..... | INST DATE. | GRANTOR LESSOR........................... | GRANTEE LESSEE........................... | RECORDING DATA. | LEGAL DESCRIPTION...................... |
|---|---|---|---|---|---|---|
| 02118700 | OIL AND GAS LEASE | 10/08/74 | HENRY K. ODOM, ET UX | CURRAN R. CAMPBELL, INC. | 21/661 BRAZOS COUNTY | 943 ACRES, MORE OR LESS, DESCRIBED IN LEASE. |
| 02118800 | OIL AND GAS LEASE | 08/14/74 | GIBBS BROTHERS AND COMPANY | CURRAN R. CAMPBELL, INC. | 203/414 MADISON COUNTY | 184.1 ACRES, MORE OR LESS, DESCRIBED IN LEASE. |
| 02118900 | OIL AND GAS LEASE | 08/29/74 | JAMES D. WILSON, IND. & IND. EX. | CURRAN R. CAMPBELL, INC. | 203/464 MADISON COUNTY, 21/667 BRAZOS COUNTY | 2072.33 ACRES, MORE OR LESS, DESCRIBED IN LEASE. |
| 02119500 | OIL AND GAS LEASE | 10/11/74 | RAYMOND B. BUCHANAN, ET UX | CURRAN R. CAMPBELL, INC. | 21/679 BRAZOS COUNTY | 222.06 ACRES, MORE OR LESS, DESCRIBED IN LEASE. LESS AND EXCEPTED FROM THE ABOVE ARE THE LANDS ATTRIBUTABLE TO THE H. K. ODOM WELLS, JAMES D. WILSON #4 WELL AND THE BUCHANAN #2 WELL. |

ASSOCIATED WELLS:

| PROPERTY NUMBER... | DP WELL NUMBER | WELL NAME.................... | LOCATION........................ |
|---|---|---|---|
| 21188 | 24300 | GIBBS BROS 1 | A. NUNLEY SVY., A-176 |
| 21189 | 1409,81464 | WILSON JAMES D #3 | JESSE K. DAVIS SVY. A-103 |
| 21189 | 85900 | WILSON JAMES D #2 | JESSE K. DAVIS SVY., A-103 |
| 21195 | 6900 | BUCHANAN 1 | HARDIN NEVELLE SVY., A-185 |

A True and Correct Copy of Original Filed in Madison County Clerk's Office

VOL 417 PAGE 713

VOL. 417 PAGE 714

FILED

AT 11:00 O'CLOCK A M

SEP 21 1994

JOYCE M. COLEMAN, County Clerk
BY _Audrey Steven_
DEPUTY, MADISON COUNTY, TEXAS

_Oil & Gas Asst_
_Clearing House_

STATE OF TEXAS }
COUNTY OF MADISON }

I, JOYCE M. COLEMAN, Clerk of the County Court in and for said County do hereby certify that the above instrument of writing dated the 9th day of Sept. 1994 was filed for record in my office the 21st day of September, 19 94 at 11:00 o'clock A m, and duly recorded the 26th day of September, 19 94 at 9:06 o'clock A m. in Official Records of said County, in Vol. 417 of pages 709. WITNESS my hand and seal of said office, this 26th day of September 19 94.

Joyce M. Coleman
County Clerk, Madison County, Texas

STATE OF TEXAS
COUNTY OF MADISON
I, Charlotte Barrett, County Clerk of Madison County, Texas do hereby certify that the foregoing is a true and correct copy of the original record and as same appears on record in ___Official___ Record Vol. 417
Page(s) _709-719_ in Madison County, Texas.
Given under my hand and seal of office on this day of
___September 10___ 20 12

By ___Charlotte Motheral___ Deputy

Elizabeth Motheral

# TAB B

# Order Granting Defendants' Motion for Summary Judgment on Title Issues
# (CR 1617)

No. 12-13130-012-10

| | | |
|---|---|---|
| BURLINGTON RESOURCES OIL & GAS COMPANY LP, | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | |
| PetroMax Operating Co., Inc., MD America Energy LLC f/k/a/ Woodbine Acquisition LLC, Petro Texas LLC, CH4 Energy II, LLC, and TexCal Energy South Texas, LP, | § § § § § § § § | Madison County, Texas |
| Defendants | § | 12th Judicial District |

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ON TITLE ISSUES

On this day came on for consideration Defendants Motion for Summary Judgment on Title Issues (the "Motion"). This Court having considered the Motion, all responses and replies, together with any exhibits, and the arguments of counsel, has determined that the Motion should be, and hereby is, GRANTED.

It is therefore, ORDERED, ADJUDGED, and DECREED that:

1. Burlington does not own any interest in the AMI described in the 1975 Letter Agreement made the basis of this suit; and

2. The AMI provision in the 1975 Letter Agreement has terminated.

Signed this _10_ day of _December_, 2014

Filed This __11th__ Day
of __Dec__, 20_14_
at __11:15__ m O'clock
_____. Clerk
12th / 278th Judicial District Cou~
MADISON COUNTY, TEXAS
_____ Dep~

_____
Judge Presiding

*1617*

# Tab C

## Order Denying Burlington's Motion for Partial Summary Judgment Seeking Various Declarations
## (CR 1618-19)

No. 12-13130-012-10

| | | |
|---|---|---|
| BURLINGTON RESOURCES OIL & GAS COMPANY LP, | § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § § | |
| v. | § § | |
| PETROMAX OPERATING CO., INC., MD AMERICA ENERGY LLC f/k/a/ WOODBINE ACQUISITION LLC, PETRO TEXAS LLC, CH4 ENERGY II, LLC, and TEXCAL ENERGY SOUTH TEXAS, LP, | § § § § § § § | MADISON COUNTY, TEXAS |
| *Defendants* | § | 12TH JUDICIAL DISTRICT |

## ORDER DENYING BURLINGTON'S MOTION FOR PARTIAL SUMMARY JUDGMENT SEEKING VARIOUS DECLARATIONS

On this day came on for consideration Burlington Resources Oil & Gas Company LP's ("Burlington") Motion for Partial Summary Judgment Directed to Defendants Woodbine and PetroMax and Seeking Declarations that: 1) the Area of Mutual Interest of the January 7, 1975, Letter Agreement Remains in Force and Effect, 2) Burlington Jointly Owns a Leasehold Interest Within the Area of Mutual Interest and 3) Burlington's Rights Under the 1975 Letter Agreement and AMI Are Not Subject to Reduction or Limitation Based on the Amount of Burlington's Leasehold Ownership (the "Motion"). This Court having considered the Motion, all responses and replies, together with any exhibits, and the arguments of counsel, has determined that the Motion should be, and hereby is, DENIED.

Filed This _____ Day of _____, 20___ at _____ m O'clock _____. Clerk 12th / 278th Judicial District Court MADISON COUNTY, TEXAS _____ Deputy

Signed this 10 day of ___December___ , 2014

_____
Judge Presiding