# IN THE SUPREME COURT OF TEXAS

═══════════════
No. 13-0596
═══════════════

KACHINA PIPELINE COMPANY, INC., PETITIONER,

v.

MICHAEL D. LILLIS, RESPONDENT

═══════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
═══════════════════════════════════════════════════════

**Argued March 24, 2015**

JUSTICE BROWN delivered the opinion of the Court, in which JUSTICE JOHNSON, JUSTICE WILLETT, JUSTICE GUZMAN, JUSTICE LEHRMANN, and JUSTICE BOYD joined.

CHIEF JUSTICE HECHT filed an opinion concurring in part and dissenting in part, in which JUSTICE GREEN and JUSTICE DEVINE joined.

We deny the motion for rehearing filed by Kachina Pipeline Company, Inc. We withdraw our opinion of June 12, 2015, and substitute the following in its place.

In this case we interpret a written natural-gas-purchase agreement between a natural-gas producer and a pipeline operator. On summary judgment, the trial court declared the agreement entitled the pipeline operator to deduct the costs of compression from its payments to the producer. The court further declared the agreement gave the pipeline operator the option to extend the arrangement for an additional five-year term. The court of appeals reversed, holding the agreement

unambiguously allows neither the disputed deductions nor a five-year extension. We agree and thus affirm the court of appeals' judgment.

## I

Kachina Pipeline Company, Inc., owns and operates a natural-gas gathering system and pipeline. It purchases gas from several producers and transports it for resale to Davis Gas Processing at one of Davis's processing plants. Michael Lillis is one of those producers, and he has sold gas from his wells to Kachina since at least 2001. In 2003, Kachina installed the Barker Central Compression Station on its pipeline. That compression allows Kachina to resell to Davis at its high-pressure inlet, for which Davis pays a higher per-volume price. Kachina installed additional compression in 2007.

In 2005, Kachina and Lillis entered into a new Gas Purchase Agreement naming Kachina as "Buyer" and Lillis as "Seller." Under the Agreement, Lillis would transfer gas from his wells into Kachina's gathering system at specified delivery points and Kachina would pay Lillis a percentage of the proceeds it obtained through resale to Davis. A producer can successfully deliver gas only if its pressure is sufficient to overcome the working pressure in the gathering system, and the Agreement addresses the parties' rights and responsibilities as to pressure. It specifies that "neither party hereto shall be obligated to compress any gas" but provides that "[i]f Buyer installs compression to effect delivery of Seller's gas, Buyer will deduct from proceeds payable to Seller hereunder a value equal to Buyer's actual costs to install, repair, maintain and operate compression plus 20% of such costs to cover management, overhead and administration."

2

The Agreement provides it is effective for an "initial period" expiring May 2010, at which point it continues month-to-month and is cancelable by either party upon thirty days' notice. "Upon termination or cancellation of [the] Agreement, prior to Seller selling gas to a third party," Kachina has the option to "continue the purchase of gas under the terms of [the] Agreement with such adjustments in the price hereunder as may be required to yield the same economic benefit to Seller, as would be derived from the proposed third[-]party offer."

Kachina bought, transported, and resold Lillis's gas according to the Agreement. It deducted from Lillis's share of the proceeds "marketing fees," which included his pro rata share of compression costs. In 2008, Lillis entered into a purchase agreement directly with Davis and constructed his own pipeline to its plant. Around the same time, he objected to the compression fees Kachina had been deducting.

Lillis then sued, asserting that the Agreement did not authorize deduction for compression occurring after he delivered the gas to Kachina and that Kachina thus breached the Agreement by deducting those compression fees. He sought a declaration that Kachina was in breach and an accounting. He also brought a fraud claim, asserting that Kachina represented it would release him from the Agreement and that he built the new pipeline in reliance on that representation. Kachina counterclaimed, asserting Lillis breached the Agreement by failing to notify it of Davis's third-party offer. Kachina sought declarations that it had the right to deduct compression charges under the Agreement and that it exercised its option, extending the Agreement's term through May 2015.

Both parties moved for summary judgment, with Kachina filing a no-evidence motion for partial summary judgment on the fraud claim and a motion for traditional partial summary judgment

3

on the declarations it sought. The trial court denied Lillis's motion for summary judgment and granted both of Kachina's, ordering that Lillis take nothing on his claims. The court declared in its final judgment that Kachina "has the right under the 2005 Gas Purchase Agreement to deduct from [Lillis's] monthly net proceeds compression costs" and that Kachina "duly exercised its option rights under the 2005 Gas Purchase Agreement so that the termination date of the Agreement has been extended to May 31, 2015." It further awarded Kachina attorney's fees and expenses.

The court of appeals reversed those declarations. No. 03-10-00784-CV, 2013 WL 3186261, at *7, *9 (Tex. App.—Austin June 18, 2013) (mem. op.). It held the Agreement unambiguously does not allow Kachina to charge for compression that occurs after the gas transfers to Kachina, and thus it refused to consider extraneous evidence Kachina offered in an attempt to show that Lillis intended to assume such costs. *Id.* at *8. It also held that the option provided for in the Agreement does not allow for a five-year extension. *Id.* at *6. It consequently reversed the award of attorney's fees and remanded for consideration of Lillis's accounting claim. *Id.* at *11, *12. Kachina sought our review.

**II**

A declaratory judgment granted on a traditional motion for summary judgment is reviewed de novo. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Under the traditional standard for summary judgment, the movant has the burden to show that no genuine issue of material fact exists and that judgment should be granted as a matter of law. TEX. R. CIV. P. 166a(c). "When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Knott*, 128 S.W.3d at 215.

4

At issue here is the trial court's construction of the Agreement's compression-cost provision and construction of its option provision. The construction of an unambiguous contract is a question of law, also reviewed de novo. *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011). When the agreement as written is ambiguous, however, the parties' intent becomes a fact issue. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). Whether a contract is ambiguous is itself a legal question for the court. *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009).

## A

Whether the trial court properly declared the Agreement authorized deduction of the disputed costs depends on whether the compression-cost provision applies to the compression here. Kachina's deductions included Lillis's share of total system compressor costs, based on the proportion of gas moved through the system that originated from his wells. The Barker station was in place and operating at the time the parties entered into the Agreement. In 2007, Kachina added compression equipment to "enhance operations and move more gas through the system for delivery to Davis," according to Kachina's president.

Kachina argues the provision authorizes deductions for any compression that aids in the final delivery to Davis of gas bought from Lillis. Under this interpretation, Kachina rightfully deducted Lillis's share of the costs of all compression. Lillis, on the other hand, argues the provision's plain language allows deductions only for compression that Kachina installs if Lillis fails to deliver at pressures that overcome Kachina's working pressure at the point of transfer. He thus argues Kachina must show (1) Lillis has become unable to deliver against Kachina's working pressure, and (2) the

5

compression equipment was installed after the Agreement's execution. This interpretation would preclude deduction for the pre-existing compression at the Barker station. And though the compression added in 2007 would satisfy Lillis's second requirement, Kachina does not argue and the record does not support it was installed because one of Lillis's wells failed to deliver.

"In construing a contract, a court must ascertain the true intentions of the parties as expressed in the writing itself." *Italian Cowboy*, 341 S.W.3d at 333. We may consider the facts and circumstances surrounding a contract, including "the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give context to the parties' transaction." *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014)*.* But while evidence of circumstances can be used to "inform the contract text and render it capable of only one meaning," extrinsic evidence can be considered only to interpret an ambiguous writing, not to create ambiguity. *See, respectively*, *id.*; *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 283 (Tex. 1996). "A contract is not ambiguous simply because the parties disagree over its meaning." *Dynegy*, 294 S.W.3d at 168. Rather, "[i]f a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (per curiam).

"When discerning the contracting parties' intent, courts must examine the entire agreement and give effect to each provision so that none is rendered meaningless." *Tawes*, 340 S.W.3d at 425. "We give contract terms their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning." *Dynegy*, 294 S.W.3d at 168. "Moreover, we have stated that a court should construe a contract from a utilitarian standpoint, bearing in mind the particular business

6

activity sought to be served." *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1996). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Tawes*, 340 S.W.3d at 425 (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)).

Applying these rules of interpretation, we agree with Lillis that the provision unambiguously allows Kachina to deduct only the costs of compression installed during the term of the Agreement if required to overcome the working pressure in Kachina's system. A paragraph titled "Delivery Point" defines the point of transfer:

> Seller agrees to deliver and Buyer agrees to receive the gas deliverable hereunder at the outlet of Buyer['s] . . . metering facilities to be located at a mutually agreeable point(s) at or near Seller's well(s). Such point shall constitute the delivery point for all gas to be delivered hereunder.

The next paragraph provides, "Title of all gas delivered hereunder shall pass to Buyer at the delivery point." A paragraph titled "Pressure" generally addresses the pressure differential at that point:

> Pressure: Seller shall deliver the gas deliverable hereunder, at the above[-]described delivery point at a pressure sufficient to enter Buyer's pipeline against the working pressure maintained therein from time to time. Seller will regulate its[] pressures so as to not exceed the maximum allowed operating pressure (MAOP) as set from time to time by Buyer for deliveries into Buyer's gas pipeline. However, it is expressly understood and agreed that neither party hereto shall be obligated to compress any gas under the terms of this Agreement and if the well is no longer capable of delivering gas against the working pressures maintained at the delivery point and neither party elects to install a compressor, then Buyer shall, upon request from Seller, release such well and the gas produced therefrom from the terms and provisions of this Agreement. **If Buyer installs compression to effect delivery of Seller's gas, Buyer will deduct from proceeds payable to Seller hereunder a value equal to Buyer's actual costs to install, repair, maintain and operate compression, plus 20% of such costs to cover management, overhead and administration.**

(emphasis added).

The Pressure paragraph recognizes transfer into Kachina's line depends on the producer's well's pressure being sufficient to overcome Kachina's working pressure, and it imposes the duty to maintain sufficient pressure on the producer. If a well fails to overcome Kachina's working pressure, the paragraph gives Kachina two options. It may do nothing, in which case the well will be released from the Agreement. Or it may elect to install compression so that the well can overcome the working pressure. If Kachina elects the latter, it has the right to deduct costs incurred.

The contingent nature of that right is unavoidable—it arises only "[i]f [Kachina] installs compression to effect delivery." *See Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 109 (Tex. 2010) ("In order to make performance specifically conditional, a term such as 'if' . . . or some similar phrase of conditional language must normally be included." (quoting *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990))). We must reach two conclusions to make sense of this contingent phrasing. First, it does not apply to pre-existing compression. It makes little sense that the parties would have made deductions contingent on installation if they intended the provision to also cover the compression already in place at the time of the Agreement. Second, only compression installed for the purpose of overcoming Kachina's working pressure is installed to "effect delivery." The sentence immediately preceding the compression-cost provision contemplates a scenario in which "a well is no longer capable of delivering gas against the working pressures" and "neither party elects to install a compressor." Generally, well pressure tends to diminish over time as the reservoir is depleted; the Pressure paragraph creates an elective scheme that addresses this reality. Indeed, the ordinary meaning of the

8

verb "effect" is "to bring about; to make happen." BLACK'S LAW DICTIONARY 628 (10th ed. 2014). If a well's natural pressure is sufficient to overcome the working pressure at the delivery point, added compression can hardly be said to bring about delivery that would occur without it. To construe the compression-cost provision to apply to any compression would ignore its plainly contingent language and the elective scheme it creates.

Kachina argues that "delivery" includes final delivery to a third party—here, Davis—because the provision does not expressly limit "delivery" to mean only transfer into its system. When considering the Agreement as a whole and the specific context in which the provision appears, this cannot be so. The Agreement does not define the term "delivery," but it uses "deliver" or "delivery" dozens of times throughout, almost exclusively to refer to transfer from Lillis to Kachina. And, as discussed, the Pressure paragraph containing the compression-cost provision specifically addresses pressure issues at those points of transfer.

In contrast, the Agreement refers to re-delivery to a third party only twice. Once is in a paragraph titled "Reservation of Gas by Buyer," which allows Kachina to except from the Agreement gas to operate compression that is "required to provide gas to third[-]party purchasers." Thus, the Agreement contemplates Kachina may need to compress the gas for resale, but it uses the term "provide" rather than "deliver." And though Kachina may use gathered gas to fuel that compression, the provision is silent as to who bears the compression's cost. The other usage is in the price provision, which sets the price based on the net volume "delivered to and resold by the Buyer based on the price received by the Buyer for resale of same said gas delivered at the outlet of the Buyer's System." That single usage of "delivery" to refer to transfer to a third-party purchaser at the outlet

9

of Kachina's system cannot outweigh the consistency with which it is otherwise used throughout the Agreement and in the compression provision's specific textual environment.

Kachina's fall-back position is that even if "delivery" means transfer at the delivery point and not to the Davis plant, the Barker compressor "effects delivery" by creating a suction, thereby lowering the upstream pressure and aiding the flow of gas through the delivery point and into Kachina's line. The CHIEF JUSTICE agrees. While we do not question that downstream compression may function as Kachina suggests, that factual assertion does not help interpret the Agreement's language. Both Kachina and the CHIEF JUSTICE assume any compression that aids in delivery "effects delivery." But, respectfully, neither offers an alternative interpretation of the contract language that would harmonize this position with the provision's contingent phrasing and immediate context. *See FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*, 426 S.W.3d 59, 63 (Tex. 2014) ("We consider the entire writing to harmonize and effectuate all provisions such that none are rendered meaningless.").

The CHIEF JUSTICE also states that the evidence shows that Lillis would not be able to deliver to Kachina without compression. We disagree. Compression is clearly necessary for re-delivery to Davis's high-pressure intake, but the record shows Davis can also take low-pressure sales at less than 50 pounds per square inch gauge. Lillis delivers to Kachina at 50 and 80 pounds per square inch gauge, and the record establishes gas could flow from the leases through Kachina's line and to Davis without compression if Kachina had not opted for the high-pressure sale. In any case, the summary-judgment burden is Kachina's, and Lillis need not establish the compression here was not necessary for delivery to Kachina.

The Pressure paragraph acknowledges Kachina's options if faced with an underpressurized

well and shifts costs of compression installed to remedy such a situation. But there is no evidence in the record presented that Kachina ever faced an underpressurization issue. The record supports only that Kachina constructed the Barker compression station to take advantage of the higher price Davis pays for high-pressure resales and added the 2007 compression to increase the amount of gas gathered and transported. The Agreement does not address these decisions.

We do not mean to say, however, that the compression's location is determinative. The court of appeals held that "the provision does not expressly speak to whether Kachina may seek recovery for compression that occurs after gas has been transferred." 2013 WL 3186261, at *8. We disagree with the court's implicit assumption that compression occurring on Kachina's side of the delivery point cannot "effect delivery." As Kachina and two pipeline-industry amici point out, compression not only increases downstream pressure, it reduces upstream pressure, which can decrease the working pressure at the delivery points to facilitate transfer from a low-pressure well. *See, e.g.*, *Parker v. TXO Prod. Corp.*, 716 S.W.2d 644, 645 (Tex. App.—Corpus Christi 1986, no writ) (noting pipeline operator "installed compressors to better deliver the gas from the wells into [its] pipeline system"). If a well fails to deliver, Kachina can effect delivery by decreasing the working pressure in that manner. The provision allows deductions only for compression that serves that purpose, but it does not speak to the compression's location. In fact, the Agreement provides Lillis has "exclusive control and possession of the gas deliverable hereunder" until title transfers at the delivery point, and it gives Kachina no right to install any equipment upstream from the delivery point. The court of appeals' implied limitation would effectively require the parties to act beyond the rights the Agreement affords in order to give the provision effect.

11

The record reflects that Kachina had been deducting compression costs as part of its marketing fees since at least 2003 under the 2001 contract. Kachina points to Lillis's acquiescence to those fees as evidence that he knew he would share those costs. The 2001 compression-cost provision was written more broadly than its counterpart in the 2005 Agreement, however, and such acquiescence does not establish a course of dealing that supports Kachina's interpretation. *See* TEX. BUS. & COM. CODE §§ 1.303(b), 2.202(1) (defining course of dealing and allowing course of dealing to explain express terms). The 2001 contract allows deduction of a compression fee "[s]hould Seller at any Point of Delivery deliver gas into one of Buyer's pipelines whereon compression facilities are installed." That provision would certainly apply to all compression here. That the provision's language changed so drastically between the 2001 and 2005 contracts supports our interpretation of the Agreement's language. The CHIEF JUSTICE argues it makes no sense that Lillis would cease to assume his share of costs. But our task is to interpret the Agreement's language, not to justify the bargain it memorializes. *See FPL Energy*, 426 S.W.3d at 65 ("We must respect and enforce this [contract's] assignment of risk." (citing *Gym–N–I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007))).

In support of its contention that Lillis understood the Agreement allocated his share of costs of all compression, Kachina also points to Lillis's continued acquiescence to the marketing fees under the 2005 Agreement as well as deposition testimony in the record that suggests Lillis understood he would be allocated compression costs under the Agreement. A party's interpretation of an agreement is parol evidence and cannot be used to create ambiguity or show motive. *Anglo–Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 452 (Tex. 2011); *see*

12

*also Italian Cowboy*, 341 S.W.3d at 333–34 ("Only where a contract is ambiguous may a court consider the parties' interpretation . . . ." (quoting *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450–51 (Tex. 2008) (per curiam))). Both Lillis's acquiescence and his testimony are evidence of subjective intent that we cannot consider to contradict the provision's unambiguous legal meaning. *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 732 (Tex. 1981) (holding method of accounting in administering a contract was inadmissible evidence of a party's interpretation).

Amici have made it clear that downstream centralization of compression is both common and critical to the efficient transportation of gas to market. We do not doubt that, and we do not doubt that producers often contract to share in such costs. But the Agreement does not express an objective intent that Lillis would do so, and industry custom cannot impose obligations beyond those within the written Agreement. *See Nat'l Union*, 907 S.W.2d at 521–22 (refusing to consider evidence of industry-wide discussions because it directly conflicted with express language). Absent evidence that compression installed during the term of the Agreement was required to overcome the working pressure in Kachina's system, the Agreement does not authorize Kachina to deduct compression costs. The trial court erred to the extent it declared otherwise.

**B**

The Agreement's term provision requires Lillis to give Kachina notice of any purchase offer made by a third party, and it gives Kachina the option to "continue the purchase of gas under the terms of this Agreement with such adjustments in the price hereunder as may be required to yield the same economic benefit to [Lillis], as would be derived from the proposed third[-]party offer." The court of appeals correctly decided this provision does not support a five-year extension.

Kachina argues the provision's language supports such an extension because the five-year initial period is a "term of this Agreement." Certainly, in exercising its option, Kachina remains bound by the Agreement's original terms. But the option right granted is not the right to a new or renewed agreement; it is the right to *continue the purchase of gas* under the Agreement's terms. The five-year initial period is one of those terms. Another is that the Agreement would become month-to-month in May 2010. The express language does not subject the parties to a new agreement with a new initial term.

Kachina points to the proposed agreement between Lillis and Davis, which it says also sets a fixed price for a five-year term. The provision, however, allows adjustments only in *price* based on the outside third-party agreement. It does not import any other term from a third-party offer. Kachina's rights are confined to the Agreement regardless of the content of the Lillis–Davis agreement, price notwithstanding.

Kachina argues that because the market price of gas fluctuates, a new five-year term is required to confer the same economic benefit on Lillis as he would have received through his deal with Davis. While it may be true that generally a contract's economic value is to some extent a

14

function of its term period and that our interpretation should be informed by that commercial context, the plain language here still does not entitle Kachina to an additional five-year term. Further, the provision protects Lillis by ensuring he receives the economic benefit of any outside deal he procures after rightfully cancelling or terminating the contract. It does not confer any additional rights on Kachina, and to construe it as forcing Lillis into an extended commitment runs contrary to its purpose.

Finally, Kachina argues our construction yields the absurd result that Lillis may cancel the Agreement every month, requiring Kachina to perpetually exercise its option. The reality, however, is not so absurd. While Lillis is entitled to cancel on the first day of any month once the initial term expired, his only reason to do so would be that a third party had offered a better price. The provision recognizes that Lillis may pursue a better deal, and it indeed requires Kachina to match that deal if it is to continue purchasing from Lillis. Kachina, however, insists the business of natural-gas transportation requires substantial upfront investment in equipment and maintenance and therefore is not suited to such an unpredictable short-term arrangement. Those general concerns are not implicated here where Kachina's upfront investment has already taken place. Kachina has had the initial five-year commitment to secure a return on that investment, and it could have specifically contracted for a longer fixed term if the economics required. The option provision does not render the month-to-month term any more at odds with industry realities than it is on its own.

The trial court's declaration that Kachina extended the term of the Agreement to May 31, 2015, is inconsistent with the Agreement's express language, and the court of appeals correctly reversed it.

15

## III

Because the court of appeals correctly reversed the trial court's declarations, its reversal of the attorney's-fees award and remand to the trial court on the issue were proper. Kachina argues that because it prevailed on several issues and because some of the declarations concerning the contract issues remain intact, reversal of the entire fee award is error. Under the Uniform Declaratory Judgments Act, a trial court has discretion to award costs and attorney's fees. TEX. CIV. PRAC. & REM. CODE § 37.009. When an appellate court reverses a declaratory judgment, it may reverse an attorney's fee award, but it is not required to do so. *SAVA gumarska in kemijska industria d.d. v. Advanced Polymer Scis., Inc.*, 128 S.W.3d 304, 324 (Tex. App.—Dallas 2004, no pet.) ("[A]fter a declaratory judgment is reversed on appeal, an award of attorneys' fees may no longer be equitable and just."). Kachina may be correct that there remain grounds on which a trial court may award fees. But because we decide Kachina did not prevail on two of the primary issues in dispute, we remand the issue to determine the appropriate award of costs and fees.

Kachina also asserts that Lillis inadequately briefed the attorney's-fees issue at the court of appeals and thus waived the issue. There, Lillis requested remand of the issue of fees and costs "if the Court sustains one or more of its declaratory-judgment challenges." "[W]e liberally construe issues presented to obtain a just, fair, and equitable adjudication of the rights of the litigants." *El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 316 (Tex. 1999). Lillis phrased the request conditionally and presented it in a footnote, but he nonetheless made the request and preserved the issue. The issue was properly before the court of appeals, just as it is properly before us.

16

\* \* \*

The court of appeals correctly reversed the declarations concerning the compression-cost deductions and the Agreement's term. We affirm that court's judgment and remand to the trial court for further proceedings consistent with this opinion.

_____
Jeffrey V. Brown
Justice

OPINION DELIVERED:   October 9, 2015