

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00180-CV

———————————————

CHILDREN'S MEDICAL CENTER OF DALLAS, Appellant

V.

PROFESSIONAL AMBULANCE SALES AND SERVICE, LLC, A DELAWARE
LIMITED LIABILITY COMPANY, Appellee

On Appeal from the 348th District Court
Tarrant County, Texas
Trial Court No. 348-298913-18

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

This appeal stems from an order granting summary judgment in favor of Appellee Professional Ambulance Sales and Service, LLC, a Delaware Limited Liability Company (PASS) on the claims brought against it by Appellant Children's Medical Center of Dallas (CMCD) and denying summary judgment to CMCD on the same claims. In two issues, CMCD argues that the trial court erred by granting PASS's motion for summary judgment and by denying CMCD's motion for summary judgment. We will affirm.

## II. BACKGROUND

### A. CMCD Orders Two Ambulance Remounts from Youghall Enterprises, Inc. and Pays Youghall $325,282 for the Proposed Remount Work.

In 2017, CMCD needed certain remount[1] work performed on two of its ambulances. CMCD looked to Youghall Enterprises, Inc. d/b/a Professional Ambulance Sales & Service to complete the remount work.[2] Around July 2017, CMCD received a document titled "Sales Agreement" from Youghall relating to the

---

[1]As explained by CMCD, "The truck chassis portion of ambulances typically wears out and needs to be replaced more often than the actual ambulance box that is mounted on the chassis," and a remount "is when the old truck chassis is replaced with a new truck chassis and the ambulance box is installed or mounted on that new chassis."

[2]Although Youghall's assumed name is similar to PASS, Youghall and PASS are different entities.

2

proposed remount work. The "Sales Agreement" was signed by a Youghall sales representative, but not by CMCD, and reflected a sales price of $325,282. CMCD responded to the "Sales Agreement" with a document titled "Purchase Order," which referenced the "Sales Agreement" and showed a purchase order amount of $325,282. Youghall then sent an invoice to CMCD referencing the "Purchase Order," which reflected a balance due of $325,282. On November 9, 2017, CMCD paid $325,282 to Youghall. The $325,282 payment was deposited into Youghall's bank account, and according to the testimony of James McGregor, Youghall's owner, the payment was not segregated or kept separate from Youghall's other money in the bank account. Youghall later sent CMCD an updated invoice relating to the proposed remount work that stated "PAID 11/09/2017" and that reflected a balance due of $0.00.

**B. While the Proposed Remount Work is Pending, Youghall Enters into an Asset Purchase Agreement with PASS.**

In March 2018, while the proposed remount work was pending, Youghall entered into an asset purchase agreement with PASS.[3] Prior to entering the asset purchase agreement, Youghall provided PASS a spreadsheet listing certain "work in progress" and certain "signed sales agreements." According to Matthew Kuhn, the chief executive officer of the entity that owns PASS, the spreadsheet reflected "the pipeline, the business that [PASS] can anticipate signed sales agreements against, what

---

[3]McGregor and an entity called J McGregor, L.L.C. were also parties to the asset purchase agreement, and together with Youghall, they constituted the "Seller Parties" under the agreement.

3

was the work in process that may still be in process when the sale is consummated." Kuhn further explained, "A pipeline is, basically, work that you have taken contracts on that has not yet been consummated. So, it would be future sales that have been, for lack of a better word, guaranteed." The spreadsheet provided to PASS listed "Dallas Childrens Remounts (2)" under the heading "Signed Sales Agreements" and reflected a gross price of $325,282. According to the affidavit of Donald Crichton, the chief financial officer of the entity that owns PASS, "PASS was not aware that CMCD had pre-paid for the work on its ambulances when the [asset purchase agreement was] entered."

While the remount work requested by CMCD was mentioned in the spreadsheet that was provided to PASS prior to closing, the asset purchase agreement did not specifically reference the CMCD remount work. To that end, the asset purchase agreement contained several provisions detailing what assets were conveyed by Youghall to PASS, including the following provision relating to contracts, which is set forth in full,

> 1.1.4 Contracts. All rights in and to all sales orders and contracts of [Youghall], including without limitation, license agreements, nondisclosure agreements, assignment agreements, rights to discounts, joint venture agreements, partnership agreements, dealership agreements, maintenance agreements, sales representative agreements, service agreements, distribution agreements, agreements for leased equipment, customer contracts, customer orders, RFPs, vendor contracts, facility and equipment leases, licenses of Intellectual Property rights, repair and service contracts, warranty rights and operating agreements (i) to which [Youghall] is a party or which is attributable to or related to the Business, including all of [Youghall's] rights under said

4

Contracts (ii) pursuant to which any of the Assets are bound or subject, or (iii) involving the Assets or any insurance policies pursuant to which [Youghall] is a beneficiary or any of the Assets are insured (together, the "Assumed Contracts"). A list of all oral and written Assumed Contracts is attached hereto as Schedule 1.1.4 showing, for each such Assumed Contract, the names of the parties, the subject of the Assumed Contract, the date of the Assumed Contract, and in the case of oral contracts, a summary of the terms of the Assumed Contract. Copies of all such written Assumed Contracts have been furnished to [PASS].

Notably, while Schedule 1.1.4 listed several dealer agreements under the heading "Assumed Contracts," Schedule 1.1.4 did not list any order or agreement between Youghall and CMCD relating to the proposed remount work.

The asset purchase agreement also contained a section labeled "Assumption of Liabilities," Section 1.4, that provided, in pertinent part, that "[PASS] shall assume in writing at the Closing, only the obligations of [Youghall] set forth in the Assumed Contracts . . . and those liabilities and obligations of [Youghall] that are specifically described on Schedule 1.4 (the 'Assumed Liabilities')." Pursuant to Section 1.4, "[n]o other liabilities or obligations of any nature . . . shall be assumed by [PASS] in connection with the purchase and sale of the Assets." Notably, Schedule 1.4 listed the assumed liabilities as "[n]one."

Pursuant to Section 1.1.5 of the asset purchase agreement, Youghall also conveyed to PASS "[a]ll of [Youghall's] claims, customer deposits, [and] prepayments . . . whether or not recorded in the books and records of [Youghall]." But Section 1.2—a section labeled "Assets Not Purchased"—further provided, "Notwithstanding the provisions of Section 1.1, the Assets shall not include . . . rights

5

under any contract which is not included in the Assumed Contracts . . . [and] all cash [or] cash equivalents . . . ."

In conjunction with the asset purchase agreement, Youghall and its owner signed a non-compete agreement. Pursuant to the non-compete agreement, Youghall and its owner agreed that for a period of five years, they would not call upon or contact any of Youghall's former customers in Texas, among other locations, for the purpose of "furnishing the same or substantially similar products or services furnished at any time by [Youghall] to any Company Customer . . . ."

**C.    Following the Asset Purchase Agreement, Disputes Arise Between Youghall, PASS, and CMCD.**

According to Crichton's affidavit, "[i]mmediately after the [asset purchase agreement] was executed, PASS discovered that Youghall could not deliver assets and inventory it had promised" and that "Youghall did not have inventory it claimed to have, had failed to pay certain debts and liabilities it represented were or would be paid, and failed to disclose numerous other liabilities." After the asset purchase agreement was entered, "Youghall also revealed [to PASS] that it had been paid for the CMCD remount work, and Youghall represented [to PASS] that it would return the funds to CMCD or convey the funds to PASS." Despite that assurance, Youghall neither returned the $325,282 to CMCD, nor conveyed that money to PASS, nor performed the remount work ordered by CMCD. CMCD later contacted PASS regarding the remount work, PASS informed CMCD that Youghall never conveyed

6

the $325,282 to PASS, and PASS told CMCD that it would not perform the remount work unless CMCD paid PASS for the work.

**D. Youghall Files Suit Against PASS, CMCD Intervenes in the Suit, PASS and CMCD File Dueling Motions for Summary Judgment on CMCD's Claims Against PASS, and the Trial Court Grants PASS's Motion for Summary Judgment and Denies CMCD's Motion for Summary Judgment.**

In April 2018, Youghall filed suit against PASS seeking a declaration that Youghall had not breached the asset purchase agreement. CMCD later filed a petition in intervention in the lawsuit, bringing a breach-of-contract claim against Youghall and a money-had-and-received claim and a conversion claim against PASS. CMCD later amended its petition in intervention to add a breach-of-contract claim against PASS and a claim against PASS for tortious interference with a contract—namely that PASS interfered with the remount agreement by extracting a non-compete agreement from Youghall.

CMCD filed a motion for summary judgment on each of its claims against PASS. PASS then filed a traditional and no-evidence motion for summary judgment on each of CMCD's claims against it. The parties responded to the respective motions, and following a hearing, the trial court signed an order granting PASS's traditional and no-evidence motion for summary judgment and denying CMCD's motion for summary judgment. The trial court later signed an order severing CMCD's claims against PASS from the rest of the claims in the lawsuit, and the trial court's summary-judgment rulings became final. This appeal followed.

## III. DISCUSSION

In its first issue, CMCD argues that the trial court erred by denying its motion for summary judgment. In its second issue, CMCD contends that the trial court erred by granting PASS's motion for summary judgment.

### A. Standard of Review

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A defendant that conclusively negates at least one essential element of a plaintiff's cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c). When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary-judgment evidence and determine all questions presented. *Mann Frankfort*, 289 S.W.3d at 848. We should then render the judgment that the trial court should have rendered. *See Myrad Props., Inc. v. LaSalle Bank Nat'l Ass'n*, 300 S.W.3d 746, 753 (Tex. 2009); *Mann Frankfort*, 289 S.W.3d at 848.

## B. Breach of Contract

The trial court granted summary judgment to PASS on CMCD's breach-of-contract claim. The elements of a breach-of-contract claim are (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) resulting damages to the plaintiff. *Old Am. Ins. Co. v. Lincoln Factoring, LLC*, 571 S.W.3d 271, 282 (Tex. App.—Fort Worth 2018, no pet.); *Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 666 (Tex. App.—Fort Worth 2010, no pet.).[4]

In its traditional[5] motion for summary judgment, PASS argued that it was entitled to summary judgment because it was not a party to the remount agreement

---

[4]The asset purchase agreement contains a provision stating that it "shall be governed by and construed in accordance with the laws of the State of Delaware." Despite that choice-of-law provision, the parties cited the trial court to Texas law, not Delaware law, in their respective motions for summary judgment and summary-judgment responses. On appeal, PASS cites only to Texas law, while CMCD cites to both Texas and Delaware law. Neither party alleges that there is a conflict between Texas and Delaware law; indeed, CMCD's brief notes the similarities between Texas and Delaware law with respect to the contract principles at issue. "As there appears to be no conflict of laws, 'there can be no harm in applying Texas law.'" *In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 606 (Tex. 2005) (orig. proceeding) (quoting *Compaq Comput. Corp. v. Lapray*, 135 S.W.3d 657, 672 (Tex. 2004)); *see also In re J.D. Edwards World Sols. Co.*, 87 S.W.3d 546, 550 (Tex. 2002) (orig. proceeding). We thus apply Texas law. *See Aldridge v. Thrift Fin. Mktg., LLC*, 376 S.W.3d 877, 881–82 (Tex. App.—Fort Worth 2012, no pet.) (applying Texas law despite a Delaware choice-of-law provision where the parties relied on both Texas and Delaware authorities in their briefs and did not point to any conflict between Texas and Delaware law).

[5]Although when both no-evidence and traditional summary judgment motions are filed we typically address the no-evidence motion first, *see Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004), here we will review the propriety of granting the

between Youghall and CMCD and because it did not acquire or assume responsibility for that agreement. In response, CMCD argued that PASS acquired the remount agreement through the asset purchase agreement. We are thus called to construe the asset purchase agreement.

When construing a contract, we must look to the language of the parties' agreement. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019). We give contract terms their plain and ordinary meaning unless the contract indicates that the parties intended a different meaning. *Farmers Grp., Inc. v. Geter*, 620 S.W.3d 702, 709 (Tex. 2021); *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015). "A contract's plain language controls, not 'what one side or the other alleges they intended to say but did not.'" *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017) (quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010)). We examine the entire agreement and give effect to each provision so that none is rendered meaningless. *Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 888 (Tex. 2021); *Pathfinder Oil & Gas, Inc. v. Great*

---

traditional summary judgment first because it is dispositive of CMCD's claims. *See Horton v. JP Morgan Chase Bank, N.A.*, No. 05-16-00472-CV, 2018 WL 494776, at *2 (Tex. App.—Dallas Jan. 22, 2018, no pet.) (mem. op.) (reviewing propriety of grant of traditional summary judgment before that of no-evidence summary judgment "because [the traditional] motion is dispositive of all of [appellant's] claims"); *Reynolds v. Murphy*, 188 S.W.3d 252, 258 (Tex. App.—Fort Worth 2006, pet. denied) (op. on reh'g) (reviewing propriety of grant of traditional summary judgment before that of no-evidence summary judgment "because it is dispositive of the majority of [appellant's] claims").

*W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019); *Kachina Pipeline*, 471 S.W.3d at 450. We do not give any single provision, taken alone, controlling effect; rather, we consider all provisions with reference to the entire agreement. *Kachina Pipeline*, 471 S.W.3d at 450. And consistent with the Texas Supreme Court's long-established precedent that "'[n]o one phrase, sentence, or section [of a contract] should be isolated from its setting and considered apart from the other provisions,' a specific contract provision controls over a general one." *Pathfinder Oil & Gas*, 574 S.W.3d at 889 (quoting *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994)).

If a written contract is so worded that it can be given a definite or certain legal meaning, then the contract is not ambiguous, and we will construe it as a matter of law. *Barrow-Shaver Res. Co.*, 590 S.W.3d at 479. If the contract contains two or more reasonable interpretations, the contract is ambiguous, creating a fact issue as to the parties' intent. *Id.* "[E]xtrinsic evidence can be considered only to interpret an ambiguous writing, not to create ambiguity." *Kachina Pipeline*, 471 S.W.3d at 450. The parol evidence rule does not, however, prohibit a court from considering extrinsic evidence of the facts and circumstances surrounding a contract's execution as an aid in the construction of the contract's language, but the evidence may only give the words of a contract a meaning consistent with that to which they are reasonably susceptible. *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 765 (Tex. 2018).

Here, the asset purchase agreement provides a laundry list of certain types of contracts that are included within the defined term "Assumed Contracts," including

11

"customer contracts" and "customer orders."[6] The asset purchase agreement goes on to state that "[a] list of all oral and written Assumed Contracts is attached hereto as Schedule 1.1.4 . . . ." Critically, the remount agreement was not listed on Schedule 1.1.4. CMCD argues that the fact that the remount agreement was not listed on Schedule 1.1.4 is not fatal to its breach-of-contract claim because, according to CMCD, there is a distinction between "Assumed Contracts" and "oral and written Assumed Contracts." CMCD contends that "Assumed Contracts" includes sales orders—like the remount work that CMCD ordered from Youghall—but that such sales orders are not "oral and written Assumed Contracts."

We disagree with CMCD's construction of the asset purchase agreement. CMCD is attempting to read something into the asset purchase agreement that is not there—language providing that a sales order is not an "oral and written Assumed Contract."[7] The plain meaning of Section 1.1.4 is that PASS only acquired the

_____

[6]"Texas law authorizes a successor to acquire the assets of a corporation without incurring any of the grantor corporation's liabilities unless the successor expressly assumes those liabilities." *E-Quest Mgmt., LLC v. Shaw*, 433 S.W.3d 18, 24 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). Delaware law holds similarly. *See Magnolia's at Bethany, LLC v. Artesian Consulting Eng'rs, Inc.*, C.A. No. S11 C-04-013-ESB, 2011 WL 4826106, at *1 (Del. Super. Ct. Sept. 19, 2011) (noting that under Delaware law, "[t]he general rule on successor corporate liability in a matter involving the sale of assets is that a corporation that purchases the assets of another corporation is not responsible for that corporation's liabilities," although noting that an exception applies when the purchaser expressly assumes the seller's liabilities).

[7]To support its contention that a sales order is not an "oral and written Assumed Contract," CMCD points to a statement made by Kuhn in his deposition that "Exhibit 1.1.4 assumed contracts are those assumed contracts, not sales orders."

"Assumed Contracts" that were listed on Schedule 1.1.4. *See Kachina Pipeline*, 471 S.W.3d at 450. While Section 1.1.4 states that it contains "[a] list of all oral and written Assumed Contracts," we do not think that the addition of the words "oral and written" can be construed as meaning that the term "Assumed Contracts" includes agreements that are not listed on Schedule 1.1.4. Such a construction would elevate the general laundry list of items included in the definition of "Assumed Contracts" over the specific Schedule 1.1.4 listing of "all oral and written Assumed Contracts."[8] *See Pathfinder Oil & Gas*, 574 S.W.3d at 889. Moreover, we fail to see how the sales order at issue could be made by a means other than orally or in writing. Indeed, the evidence offered by CMCD to prove the existence of the remount agreement was written evidence—namely, the "Sales Agreement," the "Purchase Order," and the invoice.

Viewing the evidence in the light most favorable to CMCD, we conclude that PASS has conclusively proven that it did not acquire the remount agreement between Youghall and CMCD through the asset purchase agreement, thus negating the element of the existence of a valid contract needed to prove CMCD's breach-of-

---

But such extrinsic evidence can only be considered to interpret an ambiguous writing, *Kachina Pipeline*, 471 S.W.3d at 450, and we find no ambiguity here. Nor do we find that Kuhn's statement is "evidence of the facts and circumstances surrounding [the asset purchase agreement's] execution." *See URI, Inc.*, 543 S.W.3d at 765.

[8]We note that the heading of Schedule 1.1.4 states "Assumed Contracts," not "Oral and Written Assumed Contracts."

contract claim. *See Mann Frankfort*, 289 S.W.3d at 848; *Old Am. Ins. Co.*, 571 S.W.3d at 282; *Rice*, 324 S.W.3d at 666. Accordingly, we hold that the trial court did not err by granting PASS's traditional motion for summary judgment and denying CMCD's motion for summary judgment on CMCD's breach-of-contract claim. We overrule this portion of CMCD's two issues.

## C. Money Had and Received

The trial court granted summary judgment to PASS on CMCD's money-had-and-received claim. To prove a money-had-and-received claim, a plaintiff must establish that (1) the defendant holds money, and (2) the money in equity and good conscience belongs to the plaintiff. *Norhill Energy LLC v. McDaniel*, 517 S.W.3d 910, 917 (Tex. App.—Fort Worth 2017, pet. denied); *Morrison v. Gage*, No. 02-15-00026-CV, 2015 WL 4043260, at *4 n.7 (Tex. App.—Fort Worth July 2, 2015, no pet.) (mem. op.). A money-had-and-received claim "is not premised on wrongdoing, but seeks to determine to which party, in equity, justice, and law, the money belongs . . . ." *Edwards v. Mid-Continent Office Distribs., L.P.*, 252 S.W.3d 833, 837 (Tex. App.—Dallas 2008, pet. denied) (citing *Staats v. Miller*, 243 S.W.2d 686, 687 (Tex. 1951)).

In its traditional motion for summary judgment, PASS argued that it was entitled to summary judgment on CMCD's money-had-and-received claim because it never acquired any money from Youghall. PASS presented as part of its summary-judgment evidence testimony from McGregor that PASS did not acquire the bank account in which Youghall deposited the $325,282 and that Youghall never paid PASS

14

any money. PASS's summary-judgment evidence also included similar testimony from Kuhn that "no monies passed from Mr. McGregor to us at all. All monies passed from us to Mr. McGregor."

In response, CMCD argued that because it made its deposit with Youghall and because PASS acquired "[a]ll of [Youghall's] claims, customer deposits, [and] prepayments," CMCD had a valid money-had-and-received claim. According to CMCD, the fact that PASS did not receive any money from Youghall is not fatal to CMCD's money-had-and-received claim because its deposit "can be traced into other assets that were also acquired by PASS, LLC, such as 'inventories' and 'products.'" *See Tri-State Chems., Inc. v. First State Bank*, 185 S.W.3d 519, 522 (Tex. App.—Amarillo 2005, no pet.) ("As a general proposition, we note that the owner of personalty wrongfully taken from him may recoup it . . . . To recoup the property, the claimant need only trace his property into the asset he seeks."). But we disagree with CMCD's contention that the $325,282 can be traced to assets acquired by PASS. The summary-judgment evidence reflects that the $325,282 payment from CMCD was deposited into Youghall's bank account and that the payment was not segregated or kept separate from Youghall's other money in the bank account. Thus, the $325,282 payment cannot be traced to assets acquired by PASS.

Viewing the evidence in the light most favorable to CMCD, we conclude that PASS has conclusively negated the element that it holds money belonging to CMCD, which is necessary for CMCD to prove its money-had-and-received claim. *See Mann*

15

*Frankfort*, 289 S.W.3d at 848; *Norhill Energy*, 517 S.W.3d at 917; *Morrison*, 2015 WL 4043260, at *4 n.7. Accordingly, we hold that the trial court did not err by granting PASS's traditional motion for summary judgment and denying CMCD's motion for summary judgment on CMCD's money-had-and-received claim. We overrule this portion of CMCD's two issues.

## D. Conversion

The trial court granted summary judgment to PASS on CMCD's conversion claim. Conversion is "the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights." *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 391 (Tex. 1997). The elements of conversion are (1) the plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights; (3) the plaintiff demanded the return of the property; and (4) the defendant refused to return the property. *Freezia v. IS Storage Venture, LLC*, 474 S.W.3d 379, 386–87 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 365–66 (Tex. App.—Dallas 2009, pet. denied) (op. on reh'g).

In its traditional motion for summary judgment, PASS argued that it was entitled to summary judgment on CMCD's conversion claim because it never wrongfully assumed or exercised dominion and control over CMCD's personal

16

property. PASS pointed to the testimony from McGregor that PASS did not acquire the bank account in which Youghall deposited the $325,282 and that Youghall never paid PASS any money. In response, CMCD pointed to its payment of $325,282 to Youghall and to the language in the asset purchase agreement that PASS was to acquire "[a]ll of [Youghall's] claims, customer deposits, [and] prepayments." But whether PASS was supposed to receive Youghall's customer deposits is a different question than whether PASS actually received Youghall's customer deposits—in this case the $325,282 payment—and, here, the evidence conclusively establishes that PASS did not receive any money from Youghall. Thus, PASS did not exercise dominion and control over CMCD's personal property because it never had dominion or control over CMCD's personal property.[9]

Viewing the evidence in the light most favorable to CMCD, we conclude that PASS has conclusively negated the element that it assumed and exercised dominion and control over CMCD's property in an unlawful and unauthorized manner, a necessary element to CMCD's conversion claim. *See Mann Frankfort*, 289 S.W.3d at 848; *Freezia*, 474 S.W.3d at 386–87; *Tex. Integrated Conveyor Sys.*, 300 S.W.3d at 365–66.

---

[9]In the facts section of its brief, CMCD points to two Youghall purchase orders that were included in the summary-judgment record. Those purchase orders each reflected that a "2018 Ford F550 Chassis" was purchased, that the vendor was Olathe Ford Sales, Inc., and that the "end user" was CMCD. Each purchase order was in the amount of $56,695. But there is no evidence that PASS ever acquired those chassis or exercised dominion and control over them. To the contrary, the summary-judgment evidence reflects that PASS purchased two other chassis from Olathe in July 2018, with the hope that CMCD would pay PASS for the proposed remount work.

17

Accordingly, we hold that the trial court did not err by granting PASS's traditional motion for summary judgment and denying CMCD's motion for summary judgment on CMCD's conversion claim. We overrule this portion of CMCD's two issues.

## E. Tortious Interference with a Contract

The trial court granted summary judgment to PASS on CMCD's claim of tortious interference with a contract. Specifically, CMCD claimed that PASS had tortiously interfered with CMCD's remount agreement with Youghall by securing a non-compete agreement from Youghall.

To prove a claim for tortious interference with a contract, a plaintiff must establish (1) the existence of a valid contract subject to interference, (2) that the defendant willfully and intentionally interfered with the contract, (3) that the interference proximately caused the plaintiff's injury, and (4) that the plaintiff incurred actual damages or loss. *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017). To prove the requisite element of intent, the plaintiff must show either (1) that the interfering party had actual knowledge of the existence of the contract and of the plaintiff's interest in it, or (2) that the interfering party had knowledge of such facts and circumstances that would lead a reasonable person to believe in the existence of the contract and the plaintiff's interest in it. *Reg'l Specialty Clinic, P.A. v. S.A. Randle & Assocs., P.C.*, 625 S.W.3d 895, 903 n.6 (Tex. App.—Houston [14th Dist.] 2021, no pet.). "Intentional interference does not require intent to injure, only that 'the actor desires to cause the consequence of his act, or that he

believes that the consequences are substantially certain to result from it.'" *Hansen*, 525 S.W.3d at 689 (quoting *Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992)).

In its traditional motion for summary judgment, PASS argued that the evidence conclusively established that it did not willfully and intentionally interfere with CMCD's agreement with Youghall and did not cause CMCD's injury. PASS pointed to evidence in the summary-judgment record:

- that it had been unaware that CMCD had prepaid for the work on its ambulances when the asset purchase agreement and non-compete agreement were entered;

- that when Youghall provided financial documents to PASS during the negotiation of the asset purchase agreement, Youghall had represented that it had no customer deposits or prepayments;

- that, prior to closing, Youghall did not supply PASS with the remount agreement with CMCD and that Youghall actively concealed that CMCD had already paid for the work;

- that the balance sheets and financial statements provided by Youghall to PASS at closing did not list or disclose the funds paid by CMCD as a customer deposit or prepayment;

- that the relevant purchase order and invoice were not provided to PASS as part of its due diligence with Youghall;

- that PASS learned of CMCD's prepayment only after the asset purchase agreement and non-compete were entered; and

- that PASS did not actually receive any of Youghall's cash deposits or prepayments.

In response, CMCD pointed to certain documents produced by PASS during the litigation—including the relevant purchase order and invoice—arguing that PASS's possession of such documents proves that PASS was on notice of CMCD's prepayment before the non-compete was entered. But just because PASS had those documents in its possession during the litigation does not establish that PASS had them when the non-compete was entered. And, to the contrary, PASS's summary-judgment evidence—namely Crichton's affidavit and Kuhn's testimony—establishes that PASS was unaware of CMCD's prepayment when the non-compete agreement was entered. Thus, we do not find that PASS had actual knowledge of the existence of the remount agreement and of CMCD's interest in it, or that PASS had knowledge of such facts and circumstances that would lead a reasonable person to believe in the existence of the remount agreement and of CMCD's interest in it. *Reg'l Specialty Clinic, P.A.*, 625 S.W.3d at 903 n.6.

Viewing the evidence in the light most favorable to CMCD, we conclude that PASS has conclusively negated the element that it willfully and intentionally interfered with the contract, an essential element of CMCD's claim for tortious interference with a contract.[10] *See Hansen*, 525 S.W.3d at 689; *Mann Frankfort*, 289 S.W.3d at 848.

---

[10]In its motion for summary judgment, PASS also argued that even if its conduct constituted tortious interference, it was entitled to summary judgment under the affirmative defenses of justification and estoppel. Because we hold that summary judgment to PASS was appropriate because the evidence conclusively established that it did not willfully and intentionally interfere with CMCD's agreement with Youghall,

20

Accordingly, we hold that the trial court did not err by granting PASS's traditional motion for summary judgment and denying CMCD's motion for summary judgment on CMCD's claim for tortious interference with a contract. We overrule this portion of CMCD's two issues.[11]

## IV. CONCLUSION

Having overruled all portions of CMCD's two issues, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered: January 27, 2022

---

we need not address PASS's entitlement to summary judgment based on its affirmative defenses. *See* Tex. R. App. P. 47.1.

[11]Because we have concluded that the trial court did not err by granting PASS's traditional motion for summary judgment, we need not consider the arguments contained in PASS's no-evidence motion for summary judgment. *See* Tex. R. App. P. 47.1.

21